(Slip Opinion)          OCTOBER TERM, 2015          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WHOLE WOMAN'S HEALTH ET AL. *v.* HELLERSTEDT, COMMISSIONER, TEXAS DEPARTMENT OF STATE HEALTH SERVICES, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 15–274.   Argued March 2, 2016—Decided June 27, 2016

A "State has a legitimate interest in seeing to it that abortion . . . is performed under circumstances that insure maximum safety for the patient." *Roe* v. *Wade*, 410 U. S. 113, 150.  But "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends," *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 877 (plurality opinion), and "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right," *id*., at 878.

In 2013, the Texas Legislature enacted House Bill 2 (H. B. 2), which contains the two provisions challenged here.  The "admitting-privileges requirement" provides that a "physician performing or inducing an abortion . . . must, on the date [of service], have active admitting privileges at a hospital . . . located not further than 30 miles from the" abortion facility.  The "surgical-center requirement" requires an "abortion facility" to meet the "minimum standards . . . for ambulatory surgical centers" under Texas law.  Before the law took effect, a group of Texas abortion providers filed the *Abbott* case, in which they lost a facial challenge to the constitutionality of the admitting-privileges provision.  After the law went into effect, petitioners, another group of abortion providers (including some *Abbott* plaintiffs), filed this suit, claiming that both the admitting-privileges and the surgical-center provisions violated the Fourteenth Amendment, as interpreted in *Casey*.  They sought injunctions preventing enforcement of the admitting-privileges provision as applied to physi-

cians at one abortion facility in McAllen and one in El Paso and pro-
hibiting enforcement of the surgical-center provision throughout Tex-
as.

Based on the parties' stipulations, expert depositions, and expert
and other trial testimony, the District Court made extensive findings,
including, but not limited to: as the admitting-privileges requirement
began to be enforced, the number of facilities providing abortions
dropped in half, from about 40 to about 20; this decrease in geograph-
ical distribution means that the number of women of reproductive
age living more than 50 miles from a clinic has doubled, the number
living more than 100 miles away has increased by 150%, the number
living more than 150 miles away by more than 350%, and the number
living more than 200 miles away by about 2,800%; the number of fa-
cilities would drop to seven or eight if the surgical-center provision
took effect, and those remaining facilities would see a significant in-
crease in patient traffic; facilities would remain only in five metropol-
itan areas; before H. B. 2's passage, abortion was an extremely safe
procedure with very low rates of complications and virtually no
deaths; it was also safer than many more common procedures not
subject to the same level of regulation; and the cost of compliance
with the surgical-center requirement would most likely exceed $1.5
million to $3 million per clinic. The court enjoined enforcement of the
provisions, holding that the surgical-center requirement imposed an
undue burden on the right of women in Texas to seek previability
abortions; that, together with that requirement, the admitting-
privileges requirement imposed an undue burden in the Rio Grande
Valley, El Paso, and West Texas; and that the provisions together
created an "impermissible obstacle as applied to all women seeking a
previability abortion."

The Fifth Circuit reversed in significant part. It concluded that res
judicata barred the District Court from holding the admitting-
privileges requirement unconstitutional statewide and that res judi-
cata also barred the challenge to the surgical-center provision. Rea-
soning that a law is "constitutional if (1) it does not have the purpose
or effect of placing a substantial obstacle in the path of a woman
seeking an abortion of a nonviable fetus and (2) it is reasonably relat-
ed to . . . a legitimate state interest," the court found that both re-
quirements were rationally related to a compelling state interest in
protecting women's health.

*Held:*

1. Petitioners' constitutional claims are not barred by res judicata.
Pp. 10–18.

(a) Res judicata neither bars petitioners' challenges to the admit-
ting-privileges requirement nor prevents the Court from awarding fa-

cial relief. The fact that several petitioners had previously brought the unsuccessful facial challenge in *Abbott* does not mean that claim preclusion, the relevant aspect of res judicata, applies. Claim preclusion prohibits "successive litigation of the very same claim," *New Hampshire* v. *Maine*, 532 U. S. 742, 748, but petitioners' as-applied postenforcement challenge and the *Abbott* plaintiffs' facial preenforcement challenge do not present the same claim. Changed circumstances showing that a constitutional harm is concrete may give rise to a new claim. *Abbott* rested upon facts and evidence presented before enforcement of the admitting-privileges requirement began, when it was unclear how clinics would be affected. This case rests upon later, concrete factual developments that occurred once enforcement started and a significant number of clinics closed.

Res judicata also does not preclude facial relief here. In addition to requesting as-applied relief, petitioners asked for other appropriate relief, and their evidence and arguments convinced the District Court of the provision's unconstitutionality across the board. Federal Rule of Civil Procedure 54(c) provides that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings," and this Court has held that if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is "proper," *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 333. Pp. 10–15.

(b) Claim preclusion also does not bar petitioners' challenge to the surgical-center requirement. In concluding that petitioners should have raised this claim in *Abbott,* the Fifth Circuit did not take account of the fact that the surgical-center provision and the admitting-privileges provision are separate provisions with two different and independent regulatory requirements. Challenges to distinct regulatory requirements are ordinarily treated as distinct claims. Moreover, the surgical-center provision's implementing regulations had not even been promulgated at the time *Abbott* was filed, and the relevant factual circumstances changed between the two suits. Pp. 16–18.

2. Both the admitting-privileges and the surgical-center requirements place a substantial obstacle in the path of women seeking a previability abortion, constitute an undue burden on abortion access, and thus violate the Constitution. Pp. 19–39.

(a) The Fifth Circuit's standard of review may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when deciding the undue burden question, but *Casey* requires courts to consider the burdens a law imposes on abortion access together with the benefits those laws confer, see 505 U. S.,

at 887–898. The Fifth Circuit's test also mistakenly equates the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable to, *e.g.,* economic legislation. And the court's requirement that legislatures resolve questions of medical uncertainty is inconsistent with this Court's case law, which has placed considerable weight upon evidence and argument presented in judicial proceedings when determining the constitutionality of laws regulating abortion procedures. See *id.,* at 888–894. Explicit legislative findings must be considered, but there were no such findings in H. B. 2. The District Court applied the correct legal standard here, considering the evidence in the record—including expert evidence—and then weighing the asserted benefits against the burdens. Pp. 19–21.

(b) The record contains adequate legal and factual support for the District Court's conclusion that the admitting-privileges requirement imposes an "undue burden" on a woman's right to choose. The requirement's purpose is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure, but the District Court, relying on evidence showing extremely low rates of serious complications before H. B. 2's passage, found no significant health-related problem for the new law to cure. The State's record evidence, in contrast, does not show how the new law advanced the State's legitimate interest in protecting women's health when compared to the prior law, which required providers to have a "working arrangement" with doctors who had admitting privileges. At the same time, the record evidence indicates that the requirement places a "substantial obstacle" in a woman's path to abortion. The dramatic drop in the number of clinics means fewer doctors, longer waiting times, and increased crowding. It also means a significant increase in the distance women of reproductive age live from an abortion clinic. Increased driving distances do not always constitute an "undue burden," but they are an additional burden, which, when taken together with others caused by the closings, and when viewed in light of the virtual absence of any health benefit, help support the District Court's "undue burden" conclusion. Pp. 21–28.

(c) The surgical-center requirement also provides few, if any, health benefits for women, poses a substantial obstacle to women seeking abortions, and constitutes an "undue burden" on their constitutional right to do so. Before this requirement was enacted, Texas law required abortion facilities to meet a host of health and safety requirements that were policed by inspections and enforced through administrative, civil, and criminal penalties. Record evidence shows that the new provision imposes a number of additional requirements that are generally unnecessary in the abortion clinic context; that it

Syllabus

provides no benefit when complications arise in the context of a medical abortion, which would generally occur after a patient has left the facility; that abortions taking place in abortion facilities are safer than common procedures that occur in outside clinics not subject to Texas' surgical-center requirements; and that Texas has waived no part of the requirement for any abortion clinics as it has done for nearly two-thirds of other covered facilities. This evidence, along with the absence of any contrary evidence, supports the District Court's conclusions, including its ultimate legal conclusion that requirement is not necessary. At the same time, the record provides adequate evidentiary support for the District Court's conclusion that the requirement places a substantial obstacle in the path of women seeking an abortion. The court found that it "strained credulity" to think that the seven or eight abortion facilities would be able to meet the demand. The Fifth Circuit discounted expert witness Dr. Grossman's testimony that the surgical-center requirement would cause the number of abortions performed by each remaining clinic to increase by a factor of about 5. But an expert may testify in the "form of an opinion" as long as that opinion rests upon "sufficient facts or data" and "reliable principles and methods." Fed. Rule Evid. 702. Here, Dr. Grossman's opinion rested upon his participation, together with other university researchers, in research tracking the number of facilities providing abortion services, using information from, among other things, the state health services department and other public sources. The District Court acted within its legal authority in finding his testimony admissible. Common sense also suggests that a physical facility that satisfies a certain physical demand will generally be unable to meet five times that demand without expanding physically or otherwise incurring significant costs. And Texas presented no evidence at trial suggesting that expansion was possible. Finally, the District Court's finding that a currently licensed abortion facility would have to incur considerable costs to meet the surgical-center requirements supports the conclusion that more surgical centers will not soon fill the gap left by closed facilities. Pp. 28–36.

(d) Texas' three additional arguments are unpersuasive. Pp. 36–39.

790 F. 3d 563 and 598, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. GINSBURG, J., filed a concurring opinion. THOMAS, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–274

WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.* JOHN HELLERSTEDT, COMMISSIONER, TEXAS DEPARTMENT OF STATE HEALTH SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2016]

JUSTICE BREYER delivered the opinion of the Court.

In *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 878 (1992), a plurality of the Court concluded that there "exists" an "undue burden" on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the "*purpose or effect*" of the provision "*is to place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability." (Emphasis added.) The plurality added that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Ibid.*

We must here decide whether two provisions of Texas' House Bill 2 violate the Federal Constitution as interpreted in *Casey*. The first provision, which we shall call the *"admitting-privileges requirement,"* says that

"[a] physician performing or inducing an abortion . . . must, on the date the abortion is performed or induced, have active admitting privileges at a hospital

that . . . is located not further than 30 miles from the location at which the abortion is performed or induced." Tex. Health & Safety Code Ann. §171.0031(a) (West Cum. Supp. 2015).

This provision amended Texas law that had previously required an abortion facility to maintain a written protocol "for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital." 38 Tex. Reg. 6546 (2013).

The second provision, which we shall call the "*surgical-center requirement,*" says that

"the minimum standards for an abortion facility must be equivalent to the minimum standards adopted under [the Texas Health and Safety Code section] for ambulatory surgical centers." Tex. Health & Safety Code Ann. §245.010(a).

We conclude that neither of these provisions offers medical benefits sufficient to justify the burdens upon access that each imposes. Each places a substantial obstacle in the path of women seeking a previability abortion, each constitutes an undue burden on abortion access, *Casey*, *supra*, at 878 (plurality opinion), and each violates the Federal Constitution. Amdt. 14, §1.

I

A

In July 2013, the Texas Legislature enacted House Bill 2 (H. B. 2 or Act). In September (before the new law took effect), a group of Texas abortion providers filed an action in Federal District Court seeking facial invalidation of the law's admitting-privileges provision. In late October, the District Court granted the injunction. *Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, 951 F. Supp. 2d 891, 901 (WD Tex. 2013). But three days later, the Fifth Circuit vacated the injunction,

thereby permitting the provision to take effect. *Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, 734 F. 3d 406, 419 (2013).

The Fifth Circuit subsequently upheld the provision, and set forth its reasons in an opinion released late the following March. In that opinion, the Fifth Circuit pointed to evidence introduced in the District Court the previous October. It noted that Texas had offered evidence designed to show that the admitting-privileges requirement "will reduce the delay in treatment and decrease health risk for abortion patients with critical complications," and that it would "'screen out' untrained or incompetent abortion providers." *Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, 748 F. 3d 583, 592 (2014) (*Abbott*). The opinion also explained that the plaintiffs had not provided sufficient evidence "that abortion practitioners will likely be unable to comply with the privileges requirement." *Id.*, at 598. The court said that all "of the major Texas cities, including Austin, Corpus Christi, Dallas, El Paso, Houston, and San Antonio," would "continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges." *Ibid.* The *Abbott* plaintiffs did not file a petition for certiorari in this Court.

B

On April 6, one week after the Fifth Circuit's decision, petitioners, a group of abortion providers (many of whom were plaintiffs in the previous lawsuit), filed the present lawsuit in Federal District Court. They sought an injunction preventing enforcement of the admitting-privileges provision as applied to physicians at two abortion facilities, one operated by Whole Woman's Health in McAllen and the other operated by Nova Health Systems in El Paso. They also sought an injunction prohibiting enforcement of the surgical-center provision anywhere in Texas.

They claimed that the admitting-privileges provision and the surgical-center provision violated the Constitution's Fourteenth Amendment, as interpreted in *Casey*.

The District Court subsequently received stipulations from the parties and depositions from the parties' experts. The court conducted a 4-day bench trial. It heard, among other testimony, the opinions from expert witnesses for both sides. On the basis of the stipulations, depositions, and testimony, that court reached the following conclusions:

1. Of Texas' population of more than 25 million people, "approximately 5.4 million" are "women" of "reproductive age," living within a geographical area of "nearly 280,000 square miles." *Whole Woman's Health* v. *Lakey*, 46 F. Supp. 3d 673, 681 (2014); see App. 244.

2. "In recent years, the number of abortions reported in Texas has stayed fairly consistent at approximately 15–16% of the reported pregnancy rate, for a total number of approximately 60,000–72,000 legal abortions performed annually." 46 F. Supp. 3d, at 681; see App. 238.

3. Prior to the enactment of H. B. 2, there were more than 40 licensed abortion facilities in Texas, which "number dropped by almost half leading up to and in the wake of enforcement of the admitting-privileges requirement that went into effect in late-October 2013." 46 F. Supp. 3d, at 681; App. 228–231.

4. If the surgical-center provision were allowed to take effect, the number of abortion facilities, after September 1, 2014, would be reduced further, so that "only seven facilities and a potential eighth will exist in Texas." 46 F. Supp. 3d, at 680; App. 182–183.

5. Abortion facilities "will remain only in Houston, Austin, San Antonio, and the Dallas/Fort Worth metropolitan region." 46 F. Supp. 3d, at 681; App. 229–230. These include "one facility in Austin, two in Dallas, one in Fort Worth, two in Houston, and either one or two in San Antonio." 46 F. Supp. 3d, at 680; App. 229–230.

6. "Based on historical data pertaining to Texas's average number of abortions, and assuming perfectly equal distribution among the remaining seven or eight providers, this would result in each facility serving between 7,500 and 10,000 patients per year. Accounting for the seasonal variations in pregnancy rates and a slightly unequal distribution of patients at each clinic, it is foreseeable that over 1,200 women per month could be vying for counseling, appointments, and follow-up visits at some of these facilities." 46 F. Supp. 3d, at 682; cf. App. 238.

7. The suggestion "that these seven or eight providers could meet the demand of the entire state stretches credulity." 46 F. Supp. 3d, at 682; see App. 238.

8. "Between November 1, 2012 and May 1, 2014," that is, before and after enforcement of the admitting-privileges requirement, "the decrease in geographical distribution of abortion facilities" has meant that the number of women of reproductive age living more than 50 miles from a clinic has doubled (from 800,000 to over 1.6 million); those living more than 100 miles has increased by 150% (from 400,000 to 1 million); those living more than 150 miles has increased by more than 350% (from 86,000 to 400,000); and those living more than 200 miles has increased by about 2,800% (from 10,000 to 290,000). After September 2014, should the surgical-center requirement go into effect, the number of women of reproductive age living significant distances from an abortion

provider will increase as follows: 2 million women of re-productive age will live more than 50 miles from an abor-tion provider; 1.3 million will live more than 100 miles from an abortion provider; 900,000 will live more than 150 miles from an abortion provider; and 750,000 more than 200 miles from an abortion provider. 46 F. Supp. 3d, at 681–682; App. 238–242.

9. The "two requirements erect a particularly high barrier for poor, rural, or disadvantaged women." 46 F. Supp. 3d, at 683; cf. App. 363–370.

10. "The great weight of evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the proce-dure." 46 F. Supp. 3d, at 684; see, *e.g.,* App. 257–259, 538; see also *id.,* at 200–202, 253–257.

11. "Abortion, as regulated by the State before the en-actment of House Bill 2, has been shown to be much safer, in terms of minor and serious complications, than many common medical procedures not subject to such intense regulation and scrutiny." 46 F. Supp. 3d, at 684; see, *e.g.,* App. 223–224 (describing risks in colonoscopies), 254 (discussing risks in vasectomy and endometrial biopsy, among others), 275–277 (discussing complication rate in plastic surgery).

12. "Additionally, risks are not appreciably lowered for patients who undergo abortions at ambulatory surgical centers as compared to nonsurgical-center facilities." 46 F. Supp. 3d, at 684; App. 202–206, 257–259.

13. "[W]omen will not obtain better care or experience more frequent positive outcomes at an ambulatory surgi-

cal center as compared to a previously licensed facility." 46 F. Supp. 3d, at 684; App. 202–206.

14. "[T]here are 433 licensed ambulatory surgical centers in Texas," of which "336 . . . are apparently either 'grandfathered' or enjo[y] the benefit of a waiver of some or all" of the surgical-center "requirements." 46 F. Supp. 3d, at 680–681; App. 184.

15. The "cost of coming into compliance" with the surgical-center requirement "for existing clinics is significant," "undisputedly approach[ing] 1 million dollars," and "most likely exceed[ing] 1.5 million dollars," with "[s]ome . . . clinics" unable to "comply due to physical size limitations of their sites." 46 F. Supp. 3d, at 682. The "cost of acquiring land and constructing a new compliant clinic will likely exceed three million dollars." *Ibid.*

On the basis of these and other related findings, the District Court determined that the surgical-center requirement "imposes an undue burden on the right of women throughout Texas to seek a previability abortion," and that the "admitting-privileges requirement, . . . in conjunction with the ambulatory-surgical-center requirement, imposes an undue burden on the right of women in the Rio Grande Valley, El Paso, and West Texas to seek a previability abortion." *Id.,* at 687. The District Court concluded that the "two provisions" would cause "the closing of almost all abortion clinics in Texas that were operating legally in the fall of 2013," and thereby create a constitutionally "impermissible obstacle as applied to all women seeking a previability abortion" by "restricting access to previously available legal facilities." *Id.,* at 687–688. On August 29, 2014, the court enjoined the enforcement of the two provisions. *Ibid.*

## C

On October 2, 2014, at Texas' request, the Court of Appeals stayed the District Court's injunction. *Whole Woman's Health* v. *Lakey*, 769 F. 3d 285, 305. Within the next two weeks, this Court vacated the Court of Appeals' stay (in substantial part) thereby leaving in effect the District Court's injunction against enforcement of the surgical-center provision and its injunction against enforcement of the admitting-privileges requirement as applied to the McAllen and El Paso clinics. *Whole Woman's Health* v. *Lakey*, 574 U. S. ___ (2014). The Court of Appeals then heard Texas' appeal.

On June 9, 2015, the Court of Appeals reversed the District Court on the merits. With minor exceptions, it found both provisions constitutional and allowed them to take effect. *Whole Women's Health* v. *Cole*, 790 F. 3d 563, 567 (*per curiam*), modified, 790 F. 3d 598 (CA5 2015). Because the Court of Appeals' decision rests upon alternative grounds and fact-related considerations, we set forth its basic reasoning in some detail. The Court of Appeals concluded:

• The District Court was wrong to hold the admitting-privileges requirement unconstitutional because (except for the clinics in McAllen and El Paso) the providers had not asked them to do so, and principles of res judicata barred relief. *Id.,* at 580–583.
• Because the providers could have brought their constitutional challenge to the surgical-center provision in their earlier lawsuit, principles of res judicata also barred that claim. *Id.,* at 581–583.
• In any event, a state law "regulating previability abortion is constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legiti-

mate state interest." *Id.,* at 572.

· "[B]oth the admitting privileges requirement and" the surgical-center requirement "were rationally related to a legitimate state interest," namely, "rais[ing] the standard and quality of care for women seeking abortions and . . . protect[ing] the health and welfare of women seeking abortions." *Id.,* at 584.

· The "[p]laintiffs" failed "to proffer competent evidence contradicting the legislature's statement of a legitimate purpose." *Id.,* at 585.

· "[T]he district court erred by substituting its own judgment [as to the provisions' effects] for that of the legislature, albeit . . . in the name of the undue burden inquiry." *Id.*, at 587.

· Holding the provisions unconstitutional on their face is improper because the plaintiffs had failed to show that either of the provisions "imposes an undue burden on a large fraction of women." *Id.,* at 590.

· The District Court erred in finding that, if the surgical-center requirement takes effect, there will be too few abortion providers in Texas to meet the demand. That factual determination was based upon the finding of one of plaintiffs' expert witnesses (Dr. Grossman) that abortion providers in Texas "'will not be able to go from providing approximately 14,000 abortions annually, as they currently are, to providing the 60,000 to 70,000 abortions that are done each year in Texas once all'" of the clinics failing to meet the surgical-center requirement "'are forced to close.'" *Id.,* at 589–590. But Dr. Grossman's opinion is (in the Court of Appeals' view) "'*ipse dixit*'"; the "'record lacks any actual evidence regarding the current or future capacity of the eight clinics'"; and there is no "evidence in the record that" the providers that currently meet the surgical-center requirement "are operating at full capacity or that they cannot increase capacity." *Ibid.*

For these and related reasons, the Court of Appeals reversed the District Court's holding that the admitting-privileges requirement is unconstitutional and its holding that the surgical-center requirement is unconstitutional. The Court of Appeals upheld in part the District Court's more specific holding that the requirements are unconstitutional as applied to the McAllen facility and Dr. Lynn (a doctor at that facility), but it reversed the District Court's holding that the surgical-center requirement is unconstitutional as applied to the facility in El Paso. In respect to this last claim, the Court of Appeals said that women in El Paso wishing to have an abortion could use abortion providers in nearby New Mexico.

## II

Before turning to the constitutional question, we must consider the Court of Appeals' procedural grounds for holding that (but for the challenge to the provisions of H. B. 2 as applied to McAllen and El Paso) petitioners were barred from bringing their constitutional challenges.

## A

### *Claim Preclusion—Admitting-Privileges Requirement*

The Court of Appeals held that there could be no facial challenge to the admitting-privileges requirement. Because several of the petitioners here had previously brought an unsuccessful facial challenge to that requirement (namely, *Abbott*, 748 F. 3d, at 605; see *supra,* at 2–3), the Court of Appeals thought that "the principle of res judicata" applied. 790 F. 3d, at 581. The Court of Appeals also held that res judicata prevented the District Court from granting facial relief to petitioners, concluding that it was improper to "facially invalidat[e] the admitting privileges requirement," because to do so would "gran[t] more relief than anyone requested or briefed." *Id.,* at 580. We hold that res judicata neither bars petitioners' challenges

to the admitting-privileges requirement nor prevents us from awarding facial relief.

For one thing, to the extent that the Court of Appeals concluded that the principle of res judicata bars any facial challenge to the admitting-privileges requirement, see *ibid.*, the court misconstrued petitioners' claims. Petitioners did not bring a facial challenge to the admitting-privileges requirement in this case but instead challenged that requirement as applied to the clinics in McAllen and El Paso. The question is whether res judicata bars petitioners' particular as-applied claims. On this point, the Court of Appeals concluded that res judicata was no bar, see 790 F. 3d, at 592, and we agree.

The doctrine of claim preclusion (the here-relevant aspect of res judicata) prohibits "successive litigation of the very same claim" by the same parties. *New Hampshire* v. *Maine*, 532 U. S. 742, 748 (2001). Petitioners' postenforcement as-applied challenge is not "the very same claim" as their preenforcement facial challenge. The Restatement of Judgments notes that development of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim. See Restatement (Second) of Judgments §24, Comment *f* (1980) ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first"); cf. *id.*, §20(2) ("A valid and final personal judgment for the defendant, which rests on the prematurity of the action or on the plaintiff's failure to satisfy a precondition to suit, does not bar another action by the plaintiff instituted after the claim has matured, or the precondition has been satisfied"); *id.,* §20, Comment *k* (discussing relationship of this rule with §24, Comment *f*). The Courts of Appeals have used similar rules to determine the contours of a new

claim for purposes of preclusion. See, *e.g., Morgan* v. *Covington*, 648 F. 3d 172, 178 (CA3 2011) ("[R]es judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint"); *Ellis* v. *CCA of Tenn. LLC*, 650 F. 3d 640, 652 (CA7 2011); *Bank of N. Y.* v. *First Millennium, Inc.*, 607 F. 3d 905, 919 (CA2 2010); *Smith* v. *Potter*, 513 F. 3d 781, 783 (CA7 2008); *Rawe* v. *Liberty Mut. Fire Ins. Co.*, 462 F. 3d 521, 529 (CA6 2006); *Manning* v. *Auburn*, 953 F. 2d 1355, 1360 (CA11 1992). The Restatement adds that, where "important human values—such as the lawfulness of continuing personal disability or restraint—are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought." §24, Comment *f*; see *Bucklew* v. *Lombardi*, 783 F. 3d 1120, 1127 (CA8 2015) (allowing as-applied challenge to execution method to proceed notwithstanding prior facial challenge).

We find this approach persuasive. Imagine a group of prisoners who claim that they are being forced to drink contaminated water. These prisoners file suit against the facility where they are incarcerated. If at first their suit is dismissed because a court does not believe that the harm would be severe enough to be unconstitutional, it would make no sense to prevent the same prisoners from bringing a later suit if time and experience eventually showed that prisoners were dying from contaminated water. Such circumstances would give rise to a new claim that the prisoners' treatment violates the Constitution. Factual developments may show that constitutional harm, which seemed too remote or speculative to afford relief at the time of an earlier suit, was in fact indisputable. In our view, such changed circumstances will give rise to a new constitutional claim. This approach is sensible, and it is consistent with our precedent. See *Abie State Bank* v. *Bryan*, 282 U. S. 765, 772 (1931) (where "suit was brought

immediately upon the enactment of the law," "decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing [its] validity . . . in the lights of the later actual experience"); cf. *Lawlor* v. *National Screen Service Corp.*, 349 U. S. 322, 328 (1955) (judgment that "precludes recovery on claims arising prior to its entry" nonetheless "cannot be given the effect of extinguishing claims which did not even then exist"); *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist"); *Nashville, C. & St. L. R. Co.* v. *Walters*, 294 U. S. 405, 415 (1935) ("A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied" (footnote omitted)); *Third Nat. Bank of Louisville* v. *Stone* 174 U. S. 432, 434 (1899) ("A question cannot be held to have been adjudged before an issue on the subject could possibly have arisen"). JUSTICE ALITO's dissenting opinion is simply wrong that changed circumstances showing that a challenged law has an unconstitutional effect can never give rise to a new claim. See *post,* at 14–15 (hereinafter the dissent).

Changed circumstances of this kind are why the claim presented in *Abbott* is not the same claim as petitioners' claim here. The claims in both *Abbott* and the present case involve "important human values." Restatement (Second) of Judgments §24, Comment *f.* We are concerned with H. B. 2's "effect . . . on women seeking abortions." *Post,* at 30 (ALITO, J., dissenting). And that effect has changed dramatically since petitioners filed their first lawsuit. *Abbott* rested on facts and evidence presented to the District Court in October 2013. 748 F. 3d, at 599, n. 14 (declining to "consider any arguments" based on "developments since the conclusion of the bench trial").

Petitioners' claim in this case rests in significant part upon later, concrete factual developments. Those developments matter. The *Abbott* plaintiffs brought their facial challenge to the admitting-privileges requirement *prior to its enforcement*—before many abortion clinics had closed and while it was still unclear how many clinics would be affected. Here, petitioners bring an as-applied challenge to the requirement *after its enforcement*—and after a large number of clinics have in fact closed. The postenforcement consequences of H. B. 2 were unknowable before it went into effect. The *Abbott* court itself recognized that "[l]ater as-applied challenges can always deal with subsequent, concrete constitutional issues." *Id.,* at 589. And the Court of Appeals in this case properly decided that new evidence presented by petitioners had given rise to a new claim and that petitioners' as-applied challenges are not precluded. See 790 F. 3d, at 591 ("We now know with certainty that the non-[surgical-center] abortion facilities have actually closed and physicians have been unable to obtain admitting privileges after diligent effort").

When individuals claim that a particular statute will produce serious constitutionally relevant adverse consequences before they have occurred—and when the courts doubt their likely occurrence—the factual difference that those adverse consequences *have in fact occurred* can make all the difference. Compare the Fifth Circuit's opinion in the earlier case, *Abbott, supra,* at 598 ("All of the major Texas cities . . . continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges"), with the facts found in this case, 46 F. Supp. 3d, at 680 (the two provisions will leave Texas with seven or eight clinics). The challenge brought in this case and the one in *Abbott* are not the "very same claim," and the doctrine of claim preclusion consequently does not bar a new challenge to the constitutionality of the admitting-privileges requirement. *New Hampshire* v. *Maine,*

532 U. S., at 748. That the litigants in *Abbott* did not seek review in this Court, as the dissent suggests they should have done, see *post,* at 10, does not prevent them from seeking review of new claims that have arisen after *Abbott* was decided. In sum, the Restatement, cases from the Courts of Appeals, our own precedent, and simple logic combine to convince us that res judicata does not bar this claim.

The Court of Appeals also concluded that the award of facial *relief* was precluded by principles of res judicata. 790 F. 3d, at 581. The court concluded that the District Court should not have "granted more relief than anyone requested or briefed." *Id.*, at 580. But in addition to asking for as-applied relief, petitioners asked for "such other and further relief as the Court may deem just, proper, and equitable." App. 167. Their evidence and arguments convinced the District Court that the provision was unconstitutional across the board. The Federal Rules of Civil Procedure state that (with an exception not relevant here) a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Rule 54(c). And we have held that, if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is "proper." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 333 (2010); see *ibid.* (in "the exercise of its judicial responsibility" it may be "necessary . . . for the Court to consider the facial validity" of a statute, even though a facial challenge was not brought); cf. Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1339 (2000) ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases"). Nothing prevents this Court from awarding facial relief as the appropriate remedy for petitioners' as-applied claims.

## B

### *Claim Preclusion—Surgical-Center Requirement*

The Court of Appeals also held that claim preclusion barred petitioners from contending that the surgical-center requirement is unconstitutional. 790 F. 3d, at 583. Although it recognized that petitioners did not bring this claim in *Abbott*, it believed that they should have done so. The court explained that petitioners' constitutional challenge to the surgical-center requirement and the challenge to the admitting-privileges requirement mounted in *Abbott*

> "arise from the same 'transactio[n] or series of connected transactions.' . . . The challenges involve the same parties and abortion facilities; the challenges are governed by the same legal standards; the provisions at issue were enacted at the same time as part of the same act; the provisions were motivated by a common purpose; the provisions are administered by the same state officials; and the challenges form a convenient trial unit because they rely on a common nucleus of operative facts." 790 F. 3d, at 581.

For all these reasons, the Court of Appeals held petitioners' challenge to H. B. 2's surgical-center requirement was precluded.

The Court of Appeals failed, however, to take account of meaningful differences. The surgical-center provision and the admitting-privileges provision are separate, distinct provisions of H. B. 2. They set forth two different, independent requirements with different enforcement dates. This Court has never suggested that challenges to two different statutory provisions that serve two different functions must be brought in a single suit. And lower courts normally treat challenges to distinct regulatory requirements as "separate claims," even when they are part of one overarching "[g]overnment regulatory scheme."

18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4408, p. 52 (2d ed. 2002, Supp. 2015); see *Hamilton's Bogarts, Inc.* v. *Michigan*, 501 F. 3d 644, 650 (CA6 2007).

That approach makes sense. The opposite approach adopted by the Court of Appeals would require treating every statutory enactment as a single transaction which a given party would only be able to challenge one time, in one lawsuit, in order to avoid the effects of claim preclusion. Such a rule would encourage a kitchen-sink approach to any litigation challenging the validity of statutes. That outcome is less than optimal—not only for litigants, but for courts.

There are other good reasons why petitioners should not have had to bring their challenge to the surgical-center provision at the same time they brought their first suit. The statute gave the Texas Department of State Health Services authority to make rules implementing the surgical-center requirement. H. B. 2, §11(a), App. to Pet. for Cert. 201a. At the time petitioners filed *Abbott*, that state agency had not yet issued any such rules. Cf. *EPA* v. *Brown*, 431 U. S. 99, 104 (1977) (*per curiam*); 13B Wright, *supra*, §3532.6, at 629 (3d ed. 2008) (most courts will not "undertake review before rules have been adopted"); *Natural Resources Defense Council, Inc.* v. *EPA*, 859 F. 2d 156, 204 (CADC 1988).

Further, petitioners might well have expected that those rules when issued would contain provisions grandfathering some then-existing abortion facilities and granting full or partial waivers to others. After all, more than three quarters of non-abortion-related surgical centers had benefited from that kind of provision. See 46 F. Supp. 3d, at 680–681 (336 of 433 existing Texas surgical centers have been grandfathered or otherwise enjoy a waiver of some of the surgical-center requirements); see also App. 299–302, 443–447, 468–469.

Finally, the relevant factual circumstances changed between *Abbott* and the present lawsuit, as we previously described. See *supra,* at 14–15.

The dissent musters only one counterargument. According to the dissent, if statutory provisions "impos[e] the same kind of burden . . . on the same kind of right" and have mutually reinforcing effects, "it is evident that" they are "part of the same transaction" and must be challenged together. *Post*, at 20, 22. But for the word "evident," the dissent points to no support for this conclusion, and we find it unconvincing. Statutes are often voluminous, with many related, yet distinct, provisions. Plaintiffs, in order to preserve their claims, need not challenge each such provision of, say, the USA PATRIOT Act, the Bipartisan Campaign Reform Act of 2002, the National Labor Relations Act, the Clean Water Act, the Antiterrorism and Effective Death Penalty Act of 1996, or the Patient Protection and Affordable Care Act in their first lawsuit.

For all of these reasons, we hold that the petitioners did not have to bring their challenge to the surgical-center provision when they challenged the admitting-privileges provision in *Abbott*. We accordingly hold that the doctrine of claim preclusion does not prevent them from bringing that challenge now.

\* \* \*

None of petitioners' claims are barred by res judicata. Five experts in civil procedure argued, in a brief supporting petitioners' request for certiorari, that "the panel's procedural ruling is so clearly incorrect" that there was no reason to decline review. Brief for Professor Michael Dorf et al. as *Amici Curiae* 22. For all of the reasons described above, we agree that the Court of Appeals' procedural ruling was incorrect. We consequently proceed to consider the merits of petitioners' claims.

## III

### *Undue Burden—Legal Standard*

We begin with the standard, as described in *Casey*. We recognize that the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." *Roe* v. *Wade*, 410 U. S. 113, 150 (1973). But, we added, "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Casey,* 505 U. S., at 877 (plurality opinion). Moreover, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.*, at 878.

The Court of Appeals wrote that a state law is "constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legitimate state interest." 790 F. 3d, at 572. The Court of Appeals went on to hold that "the district court erred by substituting its own judgment for that of the legislature" when it conducted its "undue burden inquiry," in part because "medical uncertainty underlying a statute is for resolution by legislatures, not the courts." *Id.,* at 587 (citing *Gonzales* v. *Carhart,* 550 U. S. 124, 163 (2007)).

The Court of Appeals' articulation of the relevant standard is incorrect. The first part of the Court of Appeals' test may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden. The rule announced in *Casey*, however, requires that courts consider the burdens a law imposes on abortion access together with the benefits

those laws confer.  See 505 U. S., at 887–898 (opinion of the Court) (performing this balancing with respect to a spousal notification provision); *id.,* at 899–901 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.) (same balancing with respect to a parental notification provision).  And the second part of the test is wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue. See, *e.g., Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483, 491 (1955).  The Court of Appeals' approach simply does not match the standard that this Court laid out in *Casey*, which asks courts to consider whether any burden imposed on abortion access is "undue."

The statement that legislatures, and not courts, must resolve questions of medical uncertainty is also inconsistent with this Court's case law.  Instead, the Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings. In *Casey,* for example, we relied heavily on the District Court's factual findings and the research-based submissions of *amici* in declaring a portion of the law at issue unconstitutional.  505 U. S., at 888–894 (opinion of the Court) (discussing evidence related to the prevalence of spousal abuse in determining that a spousal notification provision erected an undue burden to abortion access). And, in *Gonzales* the Court, while pointing out that we must review legislative "factfinding under a deferential standard," added that we must not "place dispositive weight" on those "findings."  550 U. S., at 165. *Gonzales* went on to point out that the "*Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.*"  *Ibid.* (emphasis added). Although there we upheld a statute regulating abortion, we did not do so solely on the basis of legislative findings

explicitly set forth in the statute, noting that "evidence presented in the District Courts contradicts" some of the legislative findings. *Id.,* at 166. In these circumstances, we said, "[u]ncritical deference to Congress' factual findings . . . is inappropriate." *Ibid.*

Unlike in *Gonzales*, the relevant statute here does not set forth any legislative findings. Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective (namely, protecting women's health). *Id.*, at 149–150. For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law. As we shall describe, the District Court did so here. It did not simply substitute its own judgment for that of the legislature. It considered the evidence in the record—including expert evidence, presented in stipulations, depositions, and testimony. It then weighed the asserted benefits against the burdens. We hold that, in so doing, the District Court applied the correct legal standard.

## IV

### *Undue Burden—Admitting-Privileges Requirement*

Turning to the lower courts' evaluation of the evidence, we first consider the admitting-privileges requirement. Before the enactment of H. B. 2, doctors who provided abortions were required to "have admitting privileges *or* have a working arrangement with a physician(s) who has admitting privileges at a local hospital in order to ensure the necessary back up for medical complications." Tex. Admin. Code, tit. 25, §139.56 (2009) (emphasis added). The new law changed this requirement by requiring that a "physician performing or inducing an abortion . . . must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that . . . is located not further than 30 miles from the location at which the abortion is performed or induced." Tex. Health & Safety

Code Ann. §171.0031(a). The District Court held that the legislative change imposed an "undue burden" on a woman's right to have an abortion. We conclude that there is adequate legal and factual support for the District Court's conclusion.

The purpose of the admitting-privileges requirement is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure. Brief for Respondents 32–37. But the District Court found that it brought about no such health-related benefit. The court found that "[t]he great weight of evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure." 46 F. Supp. 3d, at 684. Thus, there was no significant health-related problem that the new law helped to cure.

The evidence upon which the court based this conclusion included, among other things:

• A collection of at least five peer-reviewed studies on abortion complications in the first trimester, showing that the highest rate of major complications—including those complications requiring hospital admission—was less than one-quarter of 1%. See App. 269–270.
• Figures in three peer-reviewed studies showing that the highest complication rate found for the much rarer second trimester abortion was less than one-half of 1% (0.45% or about 1 out of about 200). *Id.*, at 270.
• Expert testimony to the effect that complications rarely require hospital admission, much less immediate transfer to a hospital from an outpatient clinic. *Id.*, at 266–267 (citing a study of complications occurring within six weeks after 54,911 abortions that had been paid for by the fee-for-service California Medicaid Program finding that the incidence of complications was 2.1%, the incidence of

complications requiring hospital admission was 0.23%, and that of the 54,911 abortion patients included in the study, only 15 required immediate transfer to the hospital on the day of the abortion).
• Expert testimony stating that "it is extremely unlikely that a patient will experience a serious complication at the clinic that requires emergent hospitalization" and "in the rare case in which [one does], the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital." *Id.*, at 381.
• Expert testimony stating that in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of these complications occur in the days after the abortion, not on the spot. See *id.,* at 382; see also *id.*, at 267.
• Expert testimony stating that a delay before the onset of complications is also expected for medical abortions, as "abortifacient drugs take time to exert their effects, and thus the abortion itself almost always occurs after the patient has left the abortion facility." *Id.*, at 278.
• Some experts added that, if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home. See, *e.g., id.*, at 153.

We have found nothing in Texas' record evidence that shows that, compared to prior law (which required a "working arrangement" with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health.

We add that, when directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case. See Tr. of Oral Arg. 47.

This answer is consistent with the findings of the other Federal District Courts that have considered the health benefits of other States' similar admitting-privileges laws. See *Planned Parenthood of Wis., Inc.* v. *Van Hollen*, 94 F. Supp. 3d 949, 953 (WD Wis. 2015), aff'd *sub nom. Planned Parenthood of Wis., Inc.* v. *Schimel*, 806 F. 3d 908 (CA7 2015); *Planned Parenthood Southeast, Inc.* v. *Strange*, 33 F. Supp. 3d 1330, 1378 (MD Ala. 2014).

At the same time, the record evidence indicates that the admitting-privileges requirement places a "substantial obstacle in the path of a woman's choice." *Casey*, 505 U. S., at 877 (plurality opinion). The District Court found, as of the time the admitting-privileges requirement began to be enforced, the number of facilities providing abortions dropped in half, from about 40 to about 20. 46 F. Supp. 3d, at 681. Eight abortion clinics closed in the months leading up to the requirement's effective date. See App. 229–230; cf. Brief for Planned Parenthood Federation of America et al. as *Amici Curiae* 14 (noting that abortion facilities in Waco, San Angelo, and Midland no longer operate because Planned Parenthood is "unable to find local physicians in those communities with privileges who are willing to provide abortions due to the size of those communities and the hostility that abortion providers face"). Eleven more closed on the day the admitting-privileges requirement took effect. See App. 229–230; Tr. of Oral Arg. 58.

Other evidence helps to explain why the new requirement led to the closure of clinics. We read that other evidence in light of a brief filed in this Court by the Society of Hospital Medicine. That brief describes the undisputed general fact that "hospitals often condition admitting privileges on reaching a certain number of admissions per year." Brief for Society of Hospital Medicine et al. as *Amici Curiae* 11. Returning to the District Court record, we note that, in direct testimony, the president of Nova

Health Systems, implicitly relying on this general fact, pointed out that it would be difficult for doctors regularly performing abortions at the El Paso clinic to obtain admitting privileges at nearby hospitals because "[d]uring the past 10 years, over 17,000 abortion procedures were performed at the El Paso clinic [and n]ot a single one of those patients had to be transferred to a hospital for emergency treatment, much less admitted to the hospital." App. 730. In a word, doctors would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit.

Other *amicus* briefs filed here set forth without dispute other common prerequisites to obtaining admitting privileges that have nothing to do with ability to perform medical procedures. See Brief for Medical Staff Professionals as *Amici Curiae* 20–25 (listing, for example, requirements that an applicant has treated a high number of patients in the hospital setting in the past year, clinical data requirements, residency requirements, and other discretionary factors); see also Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 16 (ACOG Brief) ("[S]ome academic hospitals will only allow medical staff membership for clinicians who also . . . accept faculty appointments"). Again, returning to the District Court record, we note that Dr. Lynn of the McAllen clinic, a veteran obstetrics and gynecology doctor who estimates that he has delivered over 15,000 babies in his 38 years in practice was unable to get admitting privileges at any of the seven hospitals within 30 miles of his clinic. App. 390–394. He was refused admitting privileges at a nearby hospital for reasons, as the hospital wrote, "not based on clinical competence considerations." *Id.,* at 393–394 (emphasis deleted). The admitting-privileges requirement does not serve any relevant credentialing function.

In our view, the record contains sufficient evidence that the admitting-privileges requirement led to the closure of half of Texas' clinics, or thereabouts. Those closures meant fewer doctors, longer waiting times, and increased crowding. Record evidence also supports the finding that after the admitting-privileges provision went into effect, the "number of women of reproductive age living in a county . . . more than 150 miles from a provider increased from approximately 86,000 to 400,000 . . . and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000." 46 F. Supp. 3d, at 681. We recognize that increased driving distances do not always constitute an "undue burden." See *Casey*, 505 U. S., at 885–887 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.). But here, those increases are but one additional burden, which, when taken together with others that the closings brought about, and when viewed in light of the virtual absence of any health benefit, lead us to conclude that the record adequately supports the District Court's "undue burden" conclusion. Cf. *id.,* at 895 (opinion of the Court) (finding burden "undue" when requirement places "substantial obstacle to a woman's choice" in "a large fraction of the cases in which" it "is relevant").

The dissent's only argument why these clinic closures, as well as the ones discussed in Part V, *infra,* may not have imposed an undue burden is this: Although "H. B. 2 caused the closure of *some* clinics," *post,* at 26 (emphasis added), other clinics may have closed for other reasons (so we should not "actually count" the burdens resulting from those closures against H. B. 2), *post*, at 30–31. But petitioners satisfied their burden to present evidence of causation by presenting direct testimony as well as plausible inferences to be drawn from the timing of the clinic closures. App. 182–183, 228–231. The District Court credited that evidence and concluded from it that H. B. 2 in fact

led to the clinic closures. 46 F. Supp. 3d, at 680–681. The dissent's speculation that perhaps other evidence, not presented at trial or credited by the District Court, might have shown that some clinics closed for unrelated reasons does not provide sufficient ground to disturb the District Court's factual finding on that issue.

In the same breath, the dissent suggests that one benefit of H. B. 2's requirements would be that they might "force unsafe facilities to shut down." *Post*, at 26. To support that assertion, the dissent points to the Kermit Gosnell scandal. Gosnell, a physician in Pennsylvania, was convicted of first-degree murder and manslaughter. He "staffed his facility with unlicensed and indifferent workers, and then let them practice medicine unsupervised" and had "[d]irty facilities; unsanitary instruments; an absence of functioning monitoring and resuscitation equipment; the use of cheap, but dangerous, drugs; illegal procedures; and inadequate emergency access for when things inevitably went wrong." Report of Grand Jury in No. 0009901–2008 (1st Jud. Dist. Pa., Jan. 14, 2011), p. 24, online at http://www.phila.gov/districtattorney/ pdfs/grandjurywomensmedical.pdf (as last visited June 24, 2016). Gosnell's behavior was terribly wrong. But there is no reason to believe that an extra layer of regulation would have affected that behavior. Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations. Regardless, Gosnell's deplorable crimes could escape detection only because his facility went uninspected for more than 15 years. *Id.*, at 20. Pre-existing Texas law already contained numerous detailed regulations covering abortion facilities, including a requirement that facilities be inspected at least annually. See *infra*, at 28 (describing those regulations). The record contains nothing to suggest that H. B. 2 would be more effective than pre-existing

Texas law at deterring wrongdoers like Gosnell from criminal behavior.

## V

### *Undue Burden—Surgical-Center Requirement*

The second challenged provision of Texas' new law sets forth the surgical-center requirement. Prior to enactment of the new requirement, Texas law required abortion facilities to meet a host of health and safety requirements. Under those pre-existing laws, facilities were subject to annual reporting and recordkeeping requirements, see Tex. Admin. Code, tit. 25, §§139.4, 139.5, 139.55, 139.58; a quality assurance program, see §139.8; personnel policies and staffing requirements, see §§139.43, 139.46; physical and environmental requirements, see §139.48; infection control standards, see §139.49; disclosure requirements, see §139.50; patient-rights standards, see §139.51; and medical- and clinical-services standards, see §139.53, including anesthesia standards, see §139.59. These requirements are policed by random and announced inspections, at least annually, see §§139.23, 139.31; Tex. Health & Safety Code Ann. §245.006(a) (West 2010), as well as administrative penalties, injunctions, civil penalties, and criminal penalties for certain violations, see Tex. Admin. Code, tit. 25, §139.33; Tex. Health & Safety Code Ann. §245.011 (criminal penalties for certain reporting violations).

H. B. 2 added the requirement that an "abortion facility" meet the "minimum standards . . . for ambulatory surgical centers" under Texas law. §245.010(a) (West Cum. Supp. 2015). The surgical-center regulations include, among other things, detailed specifications relating to the size of the nursing staff, building dimensions, and other building requirements. The nursing staff must comprise at least "an adequate number of [registered nurses] on duty to meet the following minimum staff requirements: director

of the department (or designee), and supervisory and staff personnel for each service area to assure the immediate availability of [a registered nurse] for emergency care or for any patient when needed," Tex. Admin. Code, tit. 25, §135.15(a)(3) (2016), as well as "a second individual on duty on the premises who is trained and currently certified in basic cardiac life support until all patients have been discharged from the facility" for facilities that provide moderate sedation, such as most abortion facilities, §135.15(b)(2)(A). Facilities must include a full surgical suite with an operating room that has "a clear floor area of at least 240 square feet" in which "[t]he minimum clear dimension between built-in cabinets, counters, and shelves shall be 14 feet." §135.52(d)(15)(A). There must be a preoperative patient holding room and a postoperative recovery suite. The former "shall be provided and arranged in a one-way traffic pattern so that patients entering from outside the surgical suite can change, gown, and move directly into the restricted corridor of the surgical suite," §135.52(d)(10)(A), and the latter "shall be arranged to provide a one-way traffic pattern from the restricted surgical corridor to the postoperative recovery suite, and then to the extended observation rooms or discharge," §135.52(d)(9)(A). Surgical centers must meet numerous other spatial requirements, see generally §135.52, including specific corridor widths, §135.52(e)(1)(B)(iii). Surgical centers must also have an advanced heating, ventilation, and air conditioning system, §135.52(g)(5), and must satisfy particular piping system and plumbing requirements, §135.52(h). Dozens of other sections list additional requirements that apply to surgical centers. See generally §§135.1–135.56.

There is considerable evidence in the record supporting the District Court's findings indicating that the statutory provision requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not

necessary. The District Court found that "risks are not appreciably lowered for patients who undergo abortions at ambulatory surgical centers as compared to nonsurgical-center facilities." 46 F. Supp. 3d, at 684. The court added that women "will not obtain better care or experience more frequent positive outcomes at an ambulatory surgical center as compared to a previously licensed facility." *Ibid.* And these findings are well supported.

The record makes clear that the surgical-center requirement provides no benefit when complications arise in the context of an abortion produced through medication. That is because, in such a case, complications would almost always arise only after the patient has left the facility. See *supra*, at 23; App. 278. The record also contains evidence indicating that abortions taking place in an abortion facility are safe—indeed, safer than numerous procedures that take place outside hospitals and to which Texas does not apply its surgical-center requirements. See, *e.g.*, *id.,* at 223–224, 254, 275–279. The total number of deaths in Texas from abortions was five in the period from 2001 to 2012, or about one every two years (that is to say, one out of about 120,000 to 144,000 abortions). *Id.,* at 272. Nationwide, childbirth is 14 times more likely than abortion to result in death, *ibid.*, but Texas law allows a midwife to oversee childbirth in the patient's own home. Colonoscopy, a procedure that typically takes place outside a hospital (or surgical center) setting, has a mortality rate 10 times higher than an abortion. *Id.*, at 276–277; see ACOG Brief 15 (the mortality rate for liposuction, another outpatient procedure, is 28 times higher than the mortality rate for abortion). Medical treatment after an incomplete miscarriage often involves a procedure identical to that involved in a nonmedical abortion, but it often takes place outside a hospital or surgical center. App. 254; see ACOG Brief 14 (same). And Texas partly or wholly grandfathers (or waives in whole or in part the surgical-center

requirement for) about two-thirds of the facilities to which the surgical-center standards apply. But it neither grandfathers nor provides waivers for any of the facilities that perform abortions. 46 F. Supp. 3d, at 680–681; see App. 184. These facts indicate that the surgical-center provision imposes "a requirement that simply is not based on differences" between abortion and other surgical procedures "that are reasonably related to" preserving women's health, the asserted "purpos[e] of the Act in which it is found." *Doe*, 410 U. S., at 194 (quoting *Morey* v. *Doud*, 354 U. S. 457, 465 (1957); internal quotation marks omitted).

Moreover, many surgical-center requirements are inappropriate as applied to surgical abortions. Requiring scrub facilities; maintaining a one-way traffic pattern through the facility; having ceiling, wall, and floor finishes; separating soiled utility and sterilization rooms; and regulating air pressure, filtration, and humidity control can help reduce infection where doctors conduct procedures that penetrate the skin. App. 304. But abortions typically involve either the administration of medicines or procedures performed through the natural opening of the birth canal, which is itself not sterile. See *id.*, at 302–303. Nor do provisions designed to safeguard heavily sedated patients (unable to help themselves) during fire emergencies, see Tex. Admin. Code, tit. 25, §135.41; App. 304, provide any help to abortion patients, as abortion facilities do not use general anesthesia or deep sedation, *id.,* at 304–305. Further, since the few instances in which serious complications do arise following an abortion almost always require hospitalization, not treatment at a surgical center, *id.*, at 255–256, surgical-center standards will not help in those instances either.

The upshot is that this record evidence, along with the absence of any evidence to the contrary, provides ample support for the District Court's conclusion that "[m]any of the building standards mandated by the act and its im-

plementing rules have such a tangential relationship to patient safety in the context of abortion as to be nearly arbitrary." 46 F. Supp. 3d, at 684. That conclusion, along with the supporting evidence, provides sufficient support for the more general conclusion that the surgical-center requirement "will not [provide] better care or . . . more frequent positive outcomes." *Ibid.* The record evidence thus supports the ultimate legal conclusion that the surgical-center requirement is not necessary.

At the same time, the record provides adequate evidentiary support for the District Court's conclusion that the surgical-center requirement places a substantial obstacle in the path of women seeking an abortion. The parties stipulated that the requirement would further reduce the number of abortion facilities available to seven or eight facilities, located in Houston, Austin, San Antonio, and Dallas/Fort Worth. See App. 182–183. In the District Court's view, the proposition that these "seven or eight providers could meet the demand of the entire State stretches credulity." 46 F. Supp. 3d, at 682. We take this statement as a finding that these few facilities could not "meet" that "demand."

The Court of Appeals held that this finding was "clearly erroneous." 790 F. 3d, at 590. It wrote that the finding rested upon the "'*ipse dixit*'" of one expert, Dr. Grossman, and that there was no evidence that the current surgical centers (*i.e.,* the seven or eight) are operating at full capacity or could not increase capacity. *Ibid.* Unlike the Court of Appeals, however, we hold that the record provides adequate support for the District Court's finding.

For one thing, the record contains charts and oral testimony by Dr. Grossman, who said that, as a result of the surgical-center requirement, the number of abortions that the clinics would have to provide would rise from "'14,000 abortions annually'" to "'60,000 to 70,000'"—an increase by a factor of about five. *Id.,* at 589–590. The District

Court credited Dr. Grossman as an expert witness. See 46
F. Supp. 3d, at 678–679, n. 1; *id.,* at 681, n. 4 (finding
"indicia of reliability" in Dr. Grossman's conclusions). The
Federal Rules of Evidence state that an expert may testify
in the "form of an opinion" as long as that opinion rests
upon "sufficient facts or data" and "reliable principles and
methods." Rule 702. In this case Dr. Grossman's opinion
rested upon his participation, along with other university
researchers, in research that tracked "the number of open
facilities providing abortion care in the state by . . . re-
questing information from the Texas Department of State
Health Services . . . [, t]hrough interviews with clinic
staff[,] and review of publicly available information." App.
227. The District Court acted within its legal authority in
determining that Dr. Grossman's testimony was admissi-
ble. See Fed. Rule Evid. 702; see also *Daubert* v. *Merrell
Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 589 (1993)
("[U]nder the Rules the trial judge must ensure that any
and all [expert] evidence admitted is not only relevant, but
reliable"); 29 C. Wright & V. Gold, Federal Practice and
Procedure: Evidence §6266, p. 302 (2016) ("Rule 702 im-
pose[s] on the trial judge additional responsibility to de-
termine whether that [expert] testimony is likely to pro-
mote accurate factfinding").

   For another thing, common sense suggests that, more
often than not, a physical facility that satisfies a certain
physical demand will not be able to meet five times that
demand without expanding or otherwise incurring signifi-
cant costs. Suppose that we know only that a certain
grocery store serves 200 customers per week, that a cer-
tain apartment building provides apartments for 200
families, that a certain train station welcomes 200 trains
per day. While it is conceivable that the store, the apart-
ment building, or the train station could just as easily
provide for 1,000 customers, families, or trains at no sig-
nificant additional cost, crowding, or delay, most of us

would find this possibility highly improbable. The dissent takes issue with this general, intuitive point by arguing that many places operate below capacity and that in any event, facilities could simply hire additional providers. See *post,* at 32. We disagree that, according to common sense, medical facilities, well known for their wait times, operate below capacity as a general matter. And the fact that so many facilities were forced to close by the admitting-privileges requirement means that hiring more physicians would not be quite as simple as the dissent suggests. Courts are free to base their findings on commonsense inferences drawn from the evidence. And that is what the District Court did here.

The dissent now seeks to discredit Dr. Grossman by pointing out that a preliminary prediction he made in his testimony in *Abbott* about the effect of the admitting-privileges requirement on capacity was not borne out after that provision went into effect. See *post,* at 31, n. 22. If every expert who overestimated or underestimated any figure could not be credited, courts would struggle to find expert assistance. Moreover, making a hypothesis—and then attempting to verify that hypothesis with further studies, as Dr. Grossman did—is not irresponsible. It is an essential element of the scientific method. The District Court's decision to credit Dr. Grossman's testimony was sound, particularly given that Texas provided no credible experts to rebut it. See 46 F. Supp. 3d, at 680, n. 3 (declining to credit Texas' expert witnesses, in part because Vincent Rue, a nonphysician consultant for Texas, had exercised "considerable editorial and discretionary control over the contents of the experts' reports").

Texas suggests that the seven or eight remaining clinics could expand sufficiently to provide abortions for the 60,000 to 72,000 Texas women who sought them each year. Because petitioners had satisfied their burden, the obligation was on Texas, if it could, to present evidence

rebutting that issue to the District Court. Texas admitted that it presented no such evidence. Tr. of Oral Arg. 46. Instead, Texas argued before this Court that one new clinic now serves 9,000 women annually. *Ibid.* In addition to being outside the record, that example is not representative. The clinic to which Texas referred apparently cost $26 million to construct—a fact that even more clearly demonstrates that requiring seven or eight clinics to serve five times their usual number of patients does indeed represent an undue burden on abortion access. See Planned Parenthood Debuts New Building: Its $26 Million Center in Houston is Largest of Its Kind in U. S., Houston Chronicle, May 21, 2010, p. B1.

Attempting to provide the evidence that Texas did not, the dissent points to an exhibit submitted in *Abbott* showing that three Texas surgical centers, two in Dallas as well as the $26-million facility in Houston, are each capable of serving an average of 7,000 patients per year. See *post,* at 33–35. That "average" is misleading. In addition to including the Houston clinic, which does not represent most facilities, it is underinclusive. It ignores the evidence as to the Whole Woman's Health surgical-center facility in San Antonio, the capacity of which is described as "severely limited." The exhibit does nothing to rebut the commonsense inference that the dramatic decline in the number of available facilities will cause a shortfall in capacity should H. B. 2 go into effect. And facilities that were still operating after the effective date of the admitting-privileges provision were not able to accommodate increased demand. See App. 238; Tr. of Oral Arg. 30–31; Brief for National Abortion Federation et al. as *Amici Curiae* 17–20 (citing clinics' experiences since the admitting-privileges requirement went into effect of 3-week wait times, staff burnout, and waiting rooms so full, patients had to sit on the floor or wait outside).

More fundamentally, in the face of no threat to women's

health, Texas seeks to force women to travel long distances to get abortions in crammed-to-capacity superfacilities. Patients seeking these services are less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered. Healthcare facilities and medical professionals are not fungible commodities. Surgical centers attempting to accommodate sudden, vastly increased demand, see 46 F. Supp. 3d, at 682, may find that quality of care declines. Another commonsense inference that the District Court made is that these effects would be harmful to, not supportive of, women's health. See *id.,* at 682–683.

Finally, the District Court found that the costs that a currently licensed abortion facility would have to incur to meet the surgical-center requirements were considerable, ranging from $1 million per facility (for facilities with adequate space) to $3 million per facility (where additional land must be purchased). *Id.*, at 682. This evidence supports the conclusion that more surgical centers will not soon fill the gap when licensed facilities are forced to close.

We agree with the District Court that the surgical-center requirement, like the admitting-privileges requirement, provides few, if any, health benefits for women, poses a substantial obstacle to women seeking abortions, and constitutes an "undue burden" on their constitutional right to do so.

## VI

We consider three additional arguments that Texas makes and deem none persuasive.

First, Texas argues that facial invalidation of both challenged provisions is precluded by H. B. 2's severability clause. See Brief for Respondents 50–52. The severability clause says that "every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provision in this Act, are severable from

each other." H. B. 2, §10(b), App. to Pet. for Cert. 200a. It further provides that if "any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected." *Ibid.* That language, Texas argues, means that facial invalidation of parts of the statute is not an option; instead, it says, the severability clause mandates a more narrowly tailored judicial remedy. But the challenged provisions of H. B. 2 close most of the abortion facilities in Texas and place added stress on those facilities able to remain open. They vastly increase the obstacles confronting women seeking abortions in Texas without providing any benefit to women's health capable of withstanding any meaningful scrutiny. The provisions are unconstitutional on their face: Including a severability provision in the law does not change that conclusion.

Severability clauses, it is true, do express the enacting legislature's preference for a narrow judicial remedy. As a general matter, we attempt to honor that preference. But our cases have never required us to proceed application by conceivable application when confronted with a facially unconstitutional statutory provision. "We have held that a severability clause is an aid merely; not an inexorable command." *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 884–885, n. 49 (1997) (internal quotation marks omitted). Indeed, if a severability clause could impose such a requirement on courts, legislatures would easily be able to insulate unconstitutional statutes from most facial review. See *ibid.* ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government"

(internal quotation marks omitted)).  A severability clause is not grounds for a court to "devise a judicial remedy that . . . entail[s] quintessentially legislative work."  *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 329 (2006).  Such an approach would inflict enormous costs on both courts and litigants, who would be required to proceed in this manner whenever a single application of a law might be valid.  We reject Texas' invitation to pave the way for legislatures to immunize their statutes from facial review.

Texas similarly argues that instead of finding the entire surgical-center provision unconstitutional, we should invalidate (as applied to abortion clinics) only those specific surgical-center regulations that unduly burden the provision of abortions, while leaving in place other surgical-center regulations (for example, the reader could pick any of the various examples provided by the dissent, see *post,* at 42–43).  See Brief for Respondents 52–53.  As we have explained, Texas' attempt to broadly draft a requirement to sever "applications" does not require us to proceed in piecemeal fashion when we have found the statutory provisions at issue facially unconstitutional.

Nor is that approach to the regulations even required by H. B. 2 itself.  The statute was meant to require abortion facilities to meet the integrated surgical-center standards—not some subset thereof.  The severability clause refers to severing applications of words and phrases *in the Act*, such as the surgical-center requirement as a whole.  See H. B. 2, §4, App. to Pet. for Cert. 194a.  It does not say that courts should go through the individual components of the different, surgical-center statute, let alone the individual *regulations* governing surgical centers to see whether those requirements are severable from each other as applied to abortion facilities.  Facilities subject to some subset of those regulations do not qualify as surgical centers.  And the risk of harm caused by inconsistent

application of only a fraction of interconnected regulations counsels against doing so.

Second, Texas claims that the provisions at issue here do not impose a substantial obstacle because the women affected by those laws are not a "large fraction" of Texan women "of reproductive age," which Texas reads *Casey* to have required. See Brief for Respondents 45, 48. But *Casey* used the language "large fraction" to refer to "a large fraction of cases in which [the provision at issue] is *relevant*," a class narrower than "all women," "pregnant women," or even "the class of *women seeking abortions* identified by the State." 505 U. S., at 894–895 (opinion of the Court) (emphasis added). Here, as in *Casey*, the relevant denominator is "those [women] for whom [the provision] is an actual rather than an irrelevant restriction." *Id.*, at 895.

Third, Texas looks for support to *Simopoulos* v. *Virginia*, 462 U. S. 506 (1983), a case in which this Court upheld a surgical-center requirement as applied to second-trimester abortions. This case, however, unlike *Simopoulos,* involves restrictions applicable to all abortions, not simply to those that take place during the second trimester. Most abortions in Texas occur in the first trimester, not the second. App. 236. More importantly, in *Casey* we discarded the trimester framework, and we now use "viability" as the relevant point at which a State may begin limiting women's access to abortion for reasons unrelated to maternal health. 505 U. S., at 878 (plurality opinion). Because the second trimester includes time that is both previability and postviability, *Simopoulos* cannot provide clear guidance. Further, the Court in *Simopoulos* found that the petitioner in that case, unlike petitioners here, had waived any argument that the regulation did not significantly help protect women's health. 462 U. S., at 517.

Opinion of the Court

\*        \*        \*

For these reasons the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–274

_____

WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.*
JOHN HELLERSTEDT, COMMISSIONER, TEXAS
DEPARTMENT OF STATE HEALTH SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2016]

JUSTICE GINSBURG, concurring.

The Texas law called H. B. 2 inevitably will reduce the number of clinics and doctors allowed to provide abortion services. Texas argues that H. B. 2's restrictions are constitutional because they protect the health of women who experience complications from abortions. In truth, "complications from an abortion are both rare and rarely dangerous." *Planned Parenthood of Wis., Inc.* v. *Schimel*, 806 F. 3d 908, 912 (CA7 2015). See Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 6–10 (collecting studies and concluding "[a]bortion is one of the safest medical procedures performed in the United States"); Brief for Social Science Researchers as *Amici Curiae* 5–9 (compiling studies that show "[c]omplication rates from abortion are very low"). Many medical procedures, including childbirth, are far more dangerous to patients, yet are not subject to ambulatory-surgical-center or hospital admitting-privileges requirements. See *ante,* at 31; *Planned Parenthood of Wis.*, 806 F. 3d, at 921–922. See also Brief for Social Science Researchers 9–11 (comparing statistics on risks for abortion with tonsillectomy, colonoscopy, and in-office dental surgery); Brief for American Civil Liberties Union et al. as *Amici Curiae* 7 (all District Courts to consider admitting-

privileges requirements found abortion "is at least as safe as other medical procedures routinely performed in outpatient settings"). Given those realities, it is beyond rational belief that H. B. 2 could genuinely protect the health of women, and certain that the law "would simply make it more difficult for them to obtain abortions." *Planned Parenthood of Wis.*, 806 F. 3d, at 910. When a State severely limits access to safe and legal procedures, women in desperate circumstances may resort to unlicensed rogue practitioners, *faute de mieux*, at great risk to their health and safety. See Brief for Ten Pennsylvania Abortion Care Providers as *Amici Curiae* 17–22. So long as this Court adheres to *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), Targeted Regulation of Abortion Providers laws like H. B. 2 that "do little or nothing for health, but rather strew impediments to abortion," *Planned Parenthood of Wis.*, 806 F. 3d, at 921, cannot survive judicial inspection.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–274

_____

## WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.* JOHN HELLERSTEDT, COMMISSIONER, TEXAS DEPARTMENT OF STATE HEALTH SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2016]

JUSTICE THOMAS, dissenting.

Today the Court strikes down two state statutory provisions in all of their applications, at the behest of abortion clinics and doctors. That decision exemplifies the Court's troubling tendency "to bend the rules when any effort to limit abortion, or even to speak in opposition to abortion, is at issue." *Stenberg* v. *Carhart*, 530 U. S. 914, 954 (2000) (Scalia, J., dissenting). As JUSTICE ALITO observes, see *post* (dissenting opinion), today's decision creates an abortion exception to ordinary rules of res judicata, ignores compelling evidence that Texas' law imposes no unconstitutional burden, and disregards basic principles of the severability doctrine. I write separately to emphasize how today's decision perpetuates the Court's habit of applying different rules to different constitutional rights—especially the putative right to abortion.

To begin, the very existence of this suit is a jurisprudential oddity. Ordinarily, plaintiffs cannot file suits to vindicate the constitutional rights of others. But the Court employs a different approach to rights that it favors. So in this case and many others, the Court has erroneously allowed doctors and clinics to vicariously vindicate the putative constitutional right of women seeking abortions.

This case also underscores the Court's increasingly

common practice of invoking a given level of scrutiny—here, the abortion-specific undue burden standard—while applying a different standard of review entirely. Whatever scrutiny the majority applies to Texas' law, it bears little resemblance to the undue-burden test the Court articulated in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), and its successors. Instead, the majority eviscerates important features of that test to return to a regime like the one that *Casey* repudiated.

Ultimately, this case shows why the Court never should have bent the rules for favored rights in the first place. Our law is now so riddled with special exceptions for special rights that our decisions deliver neither predictability nor the promise of a judiciary bound by the rule of law.

I

This suit is possible only because the Court has allowed abortion clinics and physicians to invoke a putative constitutional right that does not belong to them—a woman's right to abortion. The Court's third-party standing jurisprudence is no model of clarity. See *Kowalski* v. *Tesmer*, 543 U. S. 125, 135 (2004) (THOMAS, J., concurring). Driving this doctrinal confusion, the Court has shown a particular willingness to undercut restrictions on third-party standing when the right to abortion is at stake. And this case reveals a deeper flaw in straying from our normal rules: when the wrong party litigates a case, we end up resolving disputes that make for bad law.

For most of our Nation's history, plaintiffs could not challenge a statute by asserting someone else's constitutional rights. See *ibid.* This Court would "not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect and who has therefore no interest in defeating it." *Clark* v. *Kansas City*, 176 U. S. 114, 118 (1900) (internal quotation marks omitted). And

for good reason: "[C]ourts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 610–611 (1973).

In the 20th century, the Court began relaxing that rule. But even as the Court started to recognize exceptions for certain types of challenges, it stressed the strict limits of those exceptions. A plaintiff could assert a third party's rights, the Court said, but only if the plaintiff had a "close relation to the third party" and the third party faced a formidable "hindrance" to asserting his own rights. *Powers* v. *Ohio*, 499 U. S. 400, 411 (1991); accord, *Kowalski, supra,* at 130–133 (similar).

Those limits broke down, however, because the Court has been "quite forgiving" in applying these standards to certain claims. *Id.*, at 130. Some constitutional rights remained "personal rights which . . . may not be vicariously asserted." *Alderman* v. *United States*, 394 U. S. 165, 174 (1969) (Fourth Amendment rights are purely personal); see *Rakas* v. *Illinois*, 439 U. S. 128, 140, n. 8 (1978) (so is the Fifth Amendment right against self-incrimination). But the Court has abandoned such limitations on other rights, producing serious anomalies across similar factual scenarios. Lawyers cannot vicariously assert potential clients' Sixth Amendment rights because they lack any current, close relationship. *Kowalski, supra,* at 130–131. Yet litigants can assert potential jurors' rights against race or sex discrimination in jury selection even when the litigants have never met potential jurors and do not share their race or sex. *Powers, supra,* at 410–416; *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 129 (1994). And vendors can sue to invalidate state regulations implicating potential customers' equal protection rights against sex discrimination. *Craig* v. *Boren*, 429 U. S. 190, 194–197 (1976) (striking down sex-based age restrictions on purchasing beer).

Above all, the Court has been especially forgiving of third-party standing criteria for one particular category of cases: those involving the purported substantive due process right of a woman to abort her unborn child. In *Singleton* v. *Wulff*, 428 U. S. 106 (1976), a plurality of this Court fashioned a blanket rule allowing third-party standing in abortion cases. *Id.,* at 118. "[I]t generally is appropriate," said the Court, "to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Ibid.* Yet the plurality conceded that the traditional criteria for an exception to the third-party standing rule were not met. There are no "insurmountable" obstacles stopping women seeking abortions from asserting their own rights, the plurality admitted. Nor are there jurisdictional barriers. *Roe* v. *Wade*, 410 U. S. 113 (1973), held that women seeking abortions fell into the mootness exception for cases "'capable of repetition, yet seeking review,'" enabling them to sue after they terminated their pregnancies without showing that they intended to become pregnant and seek an abortion again. *Id.*, at 125. Yet, since *Singleton*, the Court has unquestioningly accepted doctors' and clinics' vicarious assertion of the constitutional rights of hypothetical patients, even as women seeking abortions have successfully and repeatedly asserted their own rights before this Court.[1]

_____

[1] Compare, *e.g., Gonzales* v. *Carhart,* 550 U. S. 124 (2007), and *Stenberg* v. *Carhart*, 530 U. S. 914 (2000); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 851 (1992) (assuming that physicians and clinics can vicariously assert women's right to abortion), with*, e.g., Leavitt* v. *Jane L.*, 518 U. S. 137, 139 (1996) (*per curiam*); *Hodgson* v. *Minnesota*, 497 U. S. 417, 429 (1990); *H. L.* v. *Matheson*, 450 U. S. 398, 400 (1981); *Williams* v. *Zbaraz*, 448 U. S. 358, 361 (1980); *Harris* v. *McRae*, 448 U. S. 297, 303 (1980); *Bellotti* v. *Baird*, 428 U. S. 132, 137–138 (1976); *Poelker* v. *Doe*, 432 U. S. 519, 519 (1977) (*per curiam*); *Beal* v. *Doe*, 432 U. S. 438, 441–442 (1977); *Maher* v. *Roe*, 432 U. S. 464, 467 (1977) (women seeking abortions have capably asserted their own

Here too, the Court does not question whether doctors and clinics should be allowed to sue on behalf of Texas women seeking abortions as a matter of course. They should not. The central question under the Court's abortion precedents is whether there is an undue burden on a woman's access to abortion. See *Casey*, 505 U. S., at 877 (plurality opinion); see Part II, *infra*. But the Court's permissive approach to third-party standing encourages litigation that deprives us of the information needed to resolve that issue. Our precedents encourage abortion providers to sue—and our cases then relieve them of any obligation to prove what burdens women actually face. I find it astonishing that the majority can discover an "undue burden" on women's access to abortion for "those [women] for whom [Texas' law] is an actual rather than an irrelevant restriction," *ante*, at 39 (internal quotation marks omitted), without identifying how many women fit this description; their proximity to open clinics; or their preferences as to where they obtain abortions, and from whom. "[C]ommonsense inference[s]" that such a burden exists, *ante,* at 36, are no substitute for actual evidence. There should be no surer sign that our jurisprudence has gone off the rails than this: After creating a constitutional right to abortion because it "involve[s] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," *Casey*, *supra*, at 851 (majority opinion), the Court has created special rules that cede its enforcement to others.

## II

Today's opinion also reimagines the undue-burden standard used to assess the constitutionality of abortion restrictions. Nearly 25 years ago, in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, a plurality of

---

rights, as plaintiffs).

this Court invented the "undue burden" standard as a special test for gauging the permissibility of abortion restrictions. *Casey* held that a law is unconstitutional if it imposes an "undue burden" on a woman's ability to choose to have an abortion, meaning that it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.,* at 877. *Casey* thus instructed courts to look to whether a law substantially impedes women's access to abortion, and whether it is reasonably related to legitimate state interests. As the Court explained, "[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power" to regulate aspects of abortion procedures, "all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales* v. *Carhart*, 550 U. S. 124, 158 (2007).

I remain fundamentally opposed to the Court's abortion jurisprudence. *E.g., id.*, at 168–169 (THOMAS, J., concurring); *Stenberg,* 530 U. S., at 980, 982 (THOMAS, J., dissenting). Even taking *Casey* as the baseline, however, the majority radically rewrites the undue-burden test in three ways. First, today's decision requires courts to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Ante*, at 19. Second, today's opinion tells the courts that, when the law's justifications are medically uncertain, they need not defer to the legislature, and must instead assess medical justifications for abortion restrictions by scrutinizing the record themselves. *Ibid.* Finally, even if a law imposes no "substantial obstacle" to women's access to abortions, the law now must have more than a "reasonabl[e] relat[ion] to . . . a legitimate state interest." *Ibid.* (internal quotation marks omitted). These precepts are nowhere to be found in *Casey* or its successors, and transform the undue-burden test to something much more akin to strict scrutiny.

First, the majority's free-form balancing test is contrary to *Casey*. When assessing Pennsylvania's recordkeeping requirements for abortion providers, for instance, *Casey* did not weigh its benefits and burdens. Rather, *Casey* held that the law had a legitimate purpose because data collection advances medical research, "so it cannot be said that the requirements serve no purpose other than to make abortions more difficult." 505 U. S., at 901 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.). The opinion then asked whether the recordkeeping requirements imposed a "substantial obstacle," and found none. *Ibid.* Contrary to the majority's statements, see *ante*, at 19, *Casey* did not balance the benefits and burdens of Pennsylvania's spousal and parental notification provisions, either. Pennsylvania's spousal notification requirement, the plurality said, imposed an undue burden because findings established that the requirement would "likely . . . prevent a significant number of women from obtaining an abortion"—not because these burdens outweighed its benefits. 505 U. S., at 893 (majority opinion); see *id.,* at 887–894. And *Casey* summarily upheld parental notification provisions because even pre-*Casey* decisions had done so. *Id.*, at 899–900 (joint opinion).

Decisions in *Casey'*s wake further refute the majority's benefits-and-burdens balancing test. The Court in *Mazurek* v. *Armstrong*, 520 U. S. 968 (1997) (*per curiam*), had no difficulty upholding a Montana law authorizing only physicians to perform abortions—even though no legislative findings supported the law, and the challengers claimed that "all health evidence contradict[ed] the claim that there is any health basis for the law." *Id.,* at 973 (internal quotation marks omitted). *Mazurek* also deemed objections to the law's lack of benefits "squarely foreclosed by *Casey* itself." *Ibid.* Instead, the Court explained, "'the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed

professionals, *even if an objective assessment might suggest that those same tasks could be performed by others.'"  Ibid.* (quoting *Casey, supra*, at 885; emphasis in original); see *Gonzales*, *supra*, at 164 (relying on *Mazurek*).

Second, by rejecting the notion that "legislatures, and not courts, must resolve questions of medical uncertainty," *ante,* at 20, the majority discards another core element of the *Casey* framework.  Before today, this Court had "given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty."  *Gonzales*, 550 U. S., at 163.  This Court emphasized that this "traditional rule" of deference "is consistent with *Casey*."  *Ibid.*  This Court underscored that legislatures should not be hamstrung "if some part of the medical community were disinclined to follow the proscription."  *Id.,* at 166.  And this Court concluded that "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends." *Ibid.*; see *Stenberg*, *supra*, at 971 (KENNEDY, J., dissenting) ("the right of the legislature to resolve matters on which physicians disagreed" is "establish[ed] beyond doubt").  This Court could not have been clearer: Whenever medical justifications for an abortion restriction are debatable, that "provides a sufficient basis to conclude in [a] facial attack that the [law] does not impose an undue burden."  *Gonzales,* 550 U. S., at 164.  Otherwise, legislatures would face "too exacting" a standard.  *Id.,* at 166.

Today, however, the majority refuses to leave disputed medical science to the legislature because past cases "placed considerable weight upon the evidence and argument presented in judicial proceedings."  *Ante,* at 20.  But while *Casey* relied on record evidence to uphold Pennsylvania's spousal-notification requirement, that requirement had nothing to do with debated medical science.  505 U. S., at 888–894 (majority opinion).  And while *Gonzales* ob-

served that courts need not blindly accept all legislative findings, see *ante*, at 20, that does not help the majority. *Gonzales* refused to accept Congress' finding of "a medical consensus that the prohibited procedure is never medically necessary" because the procedure's necessity was debated within the medical community. 550 U. S., at 165–166. Having identified medical uncertainty, *Gonzales* explained how courts should resolve conflicting positions: by respecting the legislature's judgment. See *id.,* at 164.

Finally, the majority overrules another central aspect of *Casey* by requiring laws to have more than a rational basis even if they do not substantially impede access to abortion. *Ante,* at 19–20. "Where [the State] *has a rational basis to act* and it does not impose an undue burden," this Court previously held, "the State may use its regulatory power" to impose regulations "in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales*, *supra*, at 158 (emphasis added); see *Casey*, *supra,* at 878 (plurality opinion) (similar). No longer. Though the majority declines to say how substantial a State's interest must be, *ante,* at 20, one thing is clear: The State's burden has been ratcheted to a level that has not applied for a quarter century.

Today's opinion does resemble *Casey* in one respect: After disregarding significant aspects of the Court's prior jurisprudence, the majority applies the undue-burden standard in a way that will surely mystify lower courts for years to come. As in *Casey*, today's opinion "simply . . . highlight[s] certain facts in the record that apparently strike the . . . Justices as particularly significant in establishing (or refuting) the existence of an undue burden." 505 U. S., at 991 (Scalia, J., concurring in judgment in part and dissenting in part); see *ante*, at 23–24, 31–34. As in *Casey*, "the opinion then simply announces that the provision either does or does not impose a 'substantial

obstacle' or an 'undue burden.'" 505 U. S., at 991 (opinion of Scalia, J); see *ante*, at 26, 36. And still "[w]e do not know whether the same conclusions could have been reached on a different record, or in what respects the record would have had to differ before an opposite conclusion would have been appropriate." 505 U. S., at 991 (opinion of Scalia, J.); cf. *ante*, at 26, 31–32. All we know is that an undue burden now has little to do with whether the law, in a "real sense, deprive[s] women of the ultimate decision," *Casey*, *supra*, at 875, and more to do with the loss of "individualized attention, serious conversation, and emotional support," *ante,* at 36.

The majority's undue-burden test looks far less like our post-*Casey* precedents and far more like the strict-scrutiny standard that *Casey* rejected, under which only the most compelling rationales justified restrictions on abortion. See *Casey, supra,* at 871, 874–875 (plurality opinion). One searches the majority opinion in vain for any acknowledgment of the "premise central" to *Casey*'s rejection of strict scrutiny: "that the government has a legitimate and substantial interest in preserving and promoting fetal life" from conception, not just in regulating medical procedures. *Gonzales*, *supra*, at 145 (internal quotation marks omitted); see *Casey*, *supra*, at 846 (majority opinion), 871 (plurality opinion). Meanwhile, the majority's undue-burden balancing approach risks ruling out even minor, previously valid infringements on access to abortion. Moreover, by second-guessing medical evidence and making its own assessments of "quality of care" issues, *ante,* at 23–24, 30–31, 36, the majority reappoints this Court as "the country's *ex officio* medical board with powers to disapprove medical and operative practices and standards throughout the United States." *Gonzales*, *supra,* at 164 (internal quotation marks omitted). And the majority seriously burdens States, which must guess at how much more compelling their interests must be to pass muster

and what "commonsense inferences" of an undue burden this Court will identify next.

## III

The majority's furtive reconfiguration of the standard of scrutiny applicable to abortion restrictions also points to a deeper problem. The undue-burden standard is just one variant of the Court's tiers-of-scrutiny approach to constitutional adjudication. And the label the Court affixes to its level of scrutiny in assessing whether the government can restrict a given right—be it "rational basis," intermediate, strict, or something else—is increasingly a meaningless formalism. As the Court applies whatever standard it likes to any given case, nothing but empty words separates our constitutional decisions from judicial fiat.

Though the tiers of scrutiny have become a ubiquitous feature of constitutional law, they are of recent vintage. Only in the 1960's did the Court begin in earnest to speak of "strict scrutiny" versus reviewing legislation for mere rationality, and to develop the contours of these tests. See Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1274, 1284–1285 (2007). In short order, the Court adopted strict scrutiny as the standard for reviewing everything from race-based classifications under the Equal Protection Clause to restrictions on constitutionally protected speech. *Id.,* at 1275–1283. *Roe* v. *Wade*, 410 U. S. 113, then applied strict scrutiny to a purportedly "fundamental" substantive due process right for the first time. *Id.,* at 162–164; see Fallon, *supra,* at 1283; accord, *Casey, supra,* at 871 (plurality opinion) (noting that post-*Roe* cases interpreted *Roe* to demand "strict scrutiny"). Then the tiers of scrutiny proliferated into ever more gradations. See, *e.g., Craig,* 429 U. S., at 197–198 (intermediate scrutiny for sex-based classifications); *Lawrence* v. *Texas*, 539 U. S. 558, 580 (2003) (O'Connor, J., concurring in judgment) ("a more searching form of rational basis review" applies to

laws reflecting "a desire to harm a politically unpopular group"); *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976) (*per curiam*) (applying "'closest scrutiny'" to campaign-finance contribution limits). *Casey*'s undue-burden test added yet another right-specific test on the spectrum between rational-basis and strict-scrutiny review.

The illegitimacy of using "made-up tests" to "displace longstanding national traditions as the primary determinant of what the Constitution means" has long been apparent. *United States* v. *Virginia*, 518 U. S. 515, 570 (1996) (Scalia, J., dissenting). The Constitution does not prescribe tiers of scrutiny. The three basic tiers— "rational basis," intermediate, and strict scrutiny—"are no more scientific than their names suggest, and a further element of randomness is added by the fact that it is largely up to us which test will be applied in each case." *Id.,* at 567; see also *Craig, supra,* at 217–221 (Rehnquist, J., dissenting).

But the problem now goes beyond that. If our recent cases illustrate anything, it is how easily the Court tinkers with levels of scrutiny to achieve its desired result. This Term, it is easier for a State to survive strict scrutiny despite discriminating on the basis of race in college admissions than it is for the same State to regulate how abortion doctors and clinics operate under the putatively less stringent undue-burden test. All the State apparently needs to show to survive strict scrutiny is a list of aspirational educational goals (such as the "cultivat[ion of] a set of leaders with legitimacy in the eyes of the citizenry") and a "reasoned, principled explanation" for why it is pursuing them—then this Court defers. *Fisher* v. *University of Tex. at Austin, ante,* at 7, 12 (internal quotation marks omitted). Yet the same State gets no deference under the undue-burden test, despite producing evidence that abortion safety, one rationale for Texas' law, is medically debated. See *Whole Woman's Health* v. *Lakey*, 46 F. Supp.

3d 673, 684 (WD Tex. 2014) (noting conflict in expert testimony about abortion safety). Likewise, it is now easier for the government to restrict judicial candidates' campaign speech than for the Government to define marriage—even though the former is subject to strict scrutiny and the latter was supposedly subject to some form of rational-basis review. Compare *Williams-Yulee* v. *Florida Bar*, 575 U. S. \_\_\_, \_\_\_–\_\_\_ (2015) (slip op., at 8–9), with *United States* v. *Windsor*, 570 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 20).

These more recent decisions reflect the Court's tendency to relax purportedly higher standards of review for less-preferred rights. *E.g., Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 421 (2000) (THOMAS, J., dissenting) ("The Court makes no effort to justify its deviation from the tests we traditionally employ in free speech cases" to review caps on political contributions). Meanwhile, the Court selectively applies rational-basis review—under which the question is supposed to be whether "any state of facts reasonably may be conceived to justify" the law, *McGowan* v. *Maryland*, 366 U. S. 420, 426 (1961)—with formidable toughness. *E.g., Lawrence*, 539 U. S., at 580 (O'Connor, J., concurring in judgment) (at least in equal protection cases, the Court is "most likely" to find no rational basis for a law if "the challenged legislation inhibits personal relationships"); see *id.,* at 586 (Scalia, J., dissenting) (faulting the Court for applying "an unheard-of form of rational-basis review").

These labels now mean little. Whatever the Court claims to be doing, in practice it is treating its "doctrine referring to tiers of scrutiny as guidelines informing our approach to the case at hand, not tests to be mechanically applied." *Williams-Yulee*, *supra,* at \_\_\_ (slip op., at 1) (BREYER, J., concurring). The Court should abandon the pretense that anything other than policy preferences underlies its balancing of constitutional rights and inter-

ests in any given case.

## IV

It is tempting to identify the Court's invention of a constitutional right to abortion in *Roe* v. *Wade*, 410 U. S. 113, as the tipping point that transformed third-party standing doctrine and the tiers of scrutiny into an unworkable morass of special exceptions and arbitrary applications. But those roots run deeper, to the very notion that some constitutional rights demand preferential treatment. During the *Lochner* era, the Court considered the right to contract and other economic liberties to be fundamental requirements of due process of law. See *Lochner* v. *New York*, 198 U. S. 45 (1905). The Court in 1937 repudiated *Lochner*'s foundations. See *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, 386–387, 400 (1937). But the Court then created a new taxonomy of preferred rights.

In 1938, seven Justices heard a constitutional challenge to a federal ban on shipping adulterated milk in interstate commerce. Without economic substantive due process, the ban clearly invaded no constitutional right. See *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–153 (1938). Within Justice Stone's opinion for the Court, however, was a footnote that just three other Justices joined—the famous *Carolene Products* Footnote 4. See *ibid.,* n. 4; Lusky, Footnote Redux: A *Carolene Products* Reminiscence, 82 Colum. L. Rev. 1093, 1097 (1982). The footnote's first paragraph suggested that the presumption of constitutionality that ordinarily attaches to legislation might be "narrower . . . when legislation appears on its face to be within a specific prohibition of the Constitution." 304 U. S., at 152–153, n. 4. Its second paragraph appeared to question "whether legislation which restricts those political processes, which can ordinarily be expected to bring about repeal of undesirable legislation, is to be

subjected to more exacting judicial scrutiny under the general prohibitions of the [14th] Amendment than are most other types of legislation." *Ibid.* And its third and most familiar paragraph raised the question "whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *Ibid.*

Though the footnote was pure dicta, the Court seized upon it to justify its special treatment of certain personal liberties like the First Amendment and the right against discrimination on the basis of race—but also rights not enumerated in the Constitution.[2] As the Court identified which rights deserved special protection, it developed the tiers of scrutiny as part of its equal protection (and, later, due process) jurisprudence as a way to demand extra justifications for encroachments on these rights. See Fallon, 54 UCLA L. Rev., at 1270–1273, 1281–1285. And, having created a new category of fundamental rights, the Court loosened the reins to recognize even putative rights like abortion, see *Roe*, 410 U. S., at 162–164, which hardly implicate "discrete and insular minorities."

The Court also seized upon the rationale of the *Carolene Products* footnote to justify exceptions to third-party standing doctrine. The Court suggested that it was tilting the analysis to favor rights involving actual or perceived minorities—then seemingly counted the right to contra-

_____

[2] See Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1278–1291 (2007); see also Linzer, The *Carolene Products* Footnote and the Preferred Position of Individual Rights: Louis Lusky and John Hart Ely vs. Harlan Fiske Stone, 12 Const. Commentary 277, 277–278, 288–300 (1995); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 544 (1942) (Stone, C. J., concurring) (citing the *Carolene Products* footnote to suggest that the presumption of constitutionality did not fully apply to encroachments on the unenumerated personal liberty to procreate).

ception as such a right.  According to the Court, what matters is the "relationship between one who acted to protect the rights of a minority and the minority itself"— which, the Court suggested, includes the relationship "between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so." *Eisenstadt* v. *Baird*, 405 U. S. 438, 445 (1972) (citing Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L. J. 599, 631 (1962)).

Eighty years on, the Court has come full circle.  The Court has simultaneously transformed judicially created rights like the right to abortion into preferred constitutional rights, while disfavoring many of the rights actually enumerated in the Constitution.  But our Constitution renounces the notion that some constitutional rights are more equal than others.  A plaintiff either possesses the constitutional right he is asserting, or not—and if not, the judiciary has no business creating ad hoc exceptions so that others can assert rights that seem especially important to vindicate.  A law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment.  Unless the Court abides by one set of rules to adjudicate constitutional rights, it will continue reducing constitutional law to policy-driven value judgments until the last shreds of its legitimacy disappear.

\*　　\*　　\*

Today's decision will prompt some to claim victory, just as it will stiffen opponents' will to object.  But the entire Nation has lost something essential.  The majority's embrace of a jurisprudence of rights-specific exceptions and balancing tests is "a regrettable concession of defeat—an acknowledgement that we have passed the point where 'law,' properly speaking, has any further application." Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1182 (1989).  I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–274

_____

WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.*
JOHN HELLERSTEDT, COMMISSIONER, TEXAS
DEPARTMENT OF STATE HEALTH SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2016]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The constitutionality of laws regulating abortion is one of the most controversial issues in American law, but this case does not require us to delve into that contentious dispute. Instead, the dispositive issue here concerns a workaday question that can arise in any case no matter the subject, namely, whether the present case is barred by res judicata. As a court of law, we have an obligation to apply such rules in a neutral fashion in all cases, regardless of the subject of the suit. If anything, when a case involves a controversial issue, we should be especially careful to be scrupulously neutral in applying such rules.

The Court has not done so here. On the contrary, determined to strike down two provisions of a new Texas abortion statute in all of their applications, the Court simply disregards basic rules that apply in all other cases.

Here is the worst example. Shortly after Texas enacted House Bill 2 (H. B. 2) in 2013, the petitioners in this case brought suit, claiming, among other things, that a provision of the new law requiring a physician performing an abortion to have admitting privileges at a nearby hospital is "facially" unconstitutional and thus totally unenforceable. Petitioners had a fair opportunity to make their case,

but they lost on the merits in the United States Court of Appeals for the Fifth Circuit, and they chose not to petition this Court for review. The judgment against them became final. *Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, 951 F. Supp. 2d 891 (WD Tex. 2013), aff'd in part and rev'd in part, 748 F. 3d 583 (CA5 2014) (*Abbott*).

Under the rules that apply in regular cases, petitioners could not relitigate the exact same claim in a second suit. As we have said, "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 107 (1991).

In this abortion case, however, that rule is disregarded. The Court awards a victory to petitioners on the very claim that they unsuccessfully pressed in the earlier case. The Court does this even though petitioners, undoubtedly realizing that a rematch would not be allowed, did not presume to include such a claim in their complaint. The Court favors petitioners with a victory that they did not have the audacity to seek.

Here is one more example: the Court's treatment of H. B. 2's "severability clause." When part of a statute is held to be unconstitutional, the question arises whether other parts of the statute must also go. If a statute says that provisions found to be unconstitutional can be severed from the rest of the statute, the valid provisions are allowed to stand. H. B. 2 contains what must surely be the most emphatic severability clause ever written. This clause says that every single word of the statute and every possible application of its provisions is severable. But despite this language, the Court holds that no part of the challenged provisions and no application of any part of them can be saved. Provisions that are indisputably constitutional—for example, provisions that require facili-

ties performing abortions to follow basic fire safety measures—are stricken from the books. There is no possible justification for this collateral damage.

The Court's patent refusal to apply well-established law in a neutral way is indefensible and will undermine public confidence in the Court as a fair and neutral arbiter.

I

Res judicata—or, to use the more modern terminology, "claim preclusion"—is a bedrock principle of our legal system. As we said many years ago, "[p]ublic policy dictates that there be an end of litigation[,] that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Baldwin* v. *Iowa State Traveling Men's Assn.*, 283 U. S. 522, 525 (1931). This doctrine "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. . . . To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana* v. *United States*, 440 U. S. 147, 153–154 (1979). These are "vital public interests" that should be "'cordially regarded and enforced.'" *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 401 (1981).

The basic rule of preclusion is well known and has been frequently stated in our opinions. Litigation of a "cause of action" or "claim" is barred if (1) the same (or a closely related) party (2) brought a prior suit asserting the same cause of action or claim, (3) the prior case was adjudicated by a court of competent jurisdiction and (4) was decided on the merits, (5) a final judgment was entered, and (6) there is no ground, such as fraud, to invalidate the prior judg-

ment.  See *Montana, supra*, at 153; *Commissioner* v. *Sunnen*, 333 U. S. 591, 597 (1948); *Cromwell* v. *County of Sac*, 94 U. S. 351, 352–353 (1877).

## A

I turn first to the application of this rule to petitioners' claim that H. B. 2's admitting privileges requirement is facially unconstitutional.

Here, all the elements set out above are easily satisfied based on *Abbott*, the 2013 case to which I previously referred.  That case (1) was brought by a group of plaintiffs that included petitioners in the present case, (2) asserted the same cause of action or claim, namely, a facial challenge to the constitutionality of H. B. 2's admitting privileges requirement, (3) was adjudicated by courts of competent jurisdiction, (4) was decided on the merits, (5) resulted in the entry of a final judgment against petitioners, and (6) was not otherwise subject to invalidation.  All of this is clear, and that is undoubtedly why petitioners' attorneys did not even include a facial attack on the admitting privileges requirement in their complaint in this case.  To have done so would have risked sanctions for misconduct.  See *Robinson* v. *National Cash Register Co.*, 808 F. 2d 1119, 1131 (CA5 1987) (a party's "persistence in litigating [a claim] when res judicata clearly barred the suit violated rule 11"); *McLaughlin* v. *Bradlee*, 602 F. Supp. 1412, 1417 (DC 1985) ("It is especially appropriate to impose sanctions in situations where the doctrines of *res judicata* and collateral estoppel plainly preclude relitigation of the suit").

Of the elements set out above, the Court disputes only one.  The Court concludes that petitioners' prior facial attack on the admitting privileges requirement and their current facial attack on that same requirement are somehow not the same cause of action or claim.  But that conclusion is unsupported by authority and plainly wrong.

## B

Although the scope of a cause of action or claim for purposes of res judicata is hardly a new question, courts and scholars have struggled to settle upon a definition.[1] But the outcome of the present case does not depend upon the selection of the proper definition from among those adopted or recommended over the years because the majority's holding is not supported by any of them.

In *Baltimore S. S. Co.* v. *Phillips*, 274 U. S. 316 (1927), we defined a cause of action as an "actionable wrong." *Id.,* at 321; see also *ibid.* ("A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show"). On this understanding, the two claims at issue here are indisputably the same.

The same result is dictated by the rule recommended by the American Law Institute (ALI) in the first Restatement of Judgments, issued in 1942. Section 61 of the first Restatement explains when a claim asserted by a plaintiff in a second suit is the same for preclusion purposes as a claim that the plaintiff unsuccessfully litigated in a prior case. Under that provision, "the plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action." Restatement of Judgments §61. There is no doubt that this rule is satisfied here.

The second Restatement of Judgments, issued by the ALI in 1982, adopted a new approach for determining the scope of a cause of action or claim. In *Nevada* v. *United States*, 463 U. S. 110 (1983), we noted that the two Restatements differ in this regard, but we had no need to determine which was correct. *Id.,* at 130–131, and n. 12.

--------

[1] See, *e.g.*, Note, Developments in the Law: Res Judicata, 65 Harv. L. Rev. 818, 824 (1952); Cleary, Res Judicata Reexamined, 57 Yale L. J. 339, 339–340 (1948).

Here, the majority simply assumes that we should follow the second Restatement even though that Restatement— on the Court's reading, at least—leads to a conclusion that differs from the conclusion clearly dictated by the first Restatement.

If the second Restatement actually supported the majority's holding, the Court would surely be obligated to explain why it chose to follow the second Restatement's approach. But here, as in *Nevada, supra,* at 130–131, application of the rule set out in the second Restatement does not change the result. While the Court relies almost entirely on a comment to one section of the second Restatement, the Court ignores the fact that a straightforward application of the provisions of that Restatement leads to the conclusion that petitioners' two facial challenges to the admitting privileges requirement constitute a single claim.

Section 19 of the second Restatement sets out the general claim-preclusion rule that applies in a case like the one before us: "A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim." Section 24(1) then explains the scope of the "claim" that is extinguished: It "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Section 24's Comment *b*, in turn, fleshes out the key term "transaction," which it defines as "a natural grouping or common nucleus of operative facts." Whether a collection of events constitutes a single transaction is said to depend on "their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." *Ibid.*

Both the claim asserted in petitioners' first suit and the claim now revived by the Court involve the same "nucleus of operative facts." Indeed, they involve the very same

"operative facts," namely, the enactment of the admitting privileges requirement, which, according to the theory underlying petitioners' facial claims, would inevitably have the effect of causing abortion clinics to close. This is what petitioners needed to show—and what they attempted to show in their first facial attack: not that the admitting privileges requirement had *already* imposed a substantial burden on the right of Texas women to obtain abortions, but only that it *would have* that effect once clinics were able to assess whether they could practicably comply.

The Court's decision in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), makes that clear. *Casey* held that Pennsylvania's spousal notification requirement was facially unconstitutional even though that provision had been enjoined prior to enforcement. See *id.*, at 845. And the Court struck down the provision because it "*will impose* a substantial obstacle." *Id.*, at 893–894 (emphasis added). See also *id.,* at 893 ("The spousal notification requirement *is thus likely to prevent* a significant number of women from obtaining an abortion" (emphasis added)); *id.*, at 894 (Women "*are likely to be deterred* from procuring an abortion" (emphasis added)).

Consistent with this understanding, what petitioners tried to show in their first case was that the admitting privileges requirement would cause clinics to close. They claimed that their evidence showed that "at least one-third of the State's licensed providers *would stop* providing abortions once the privileges requirement took effect."[2]

----

[2] Brief for Plaintiffs-Appellees in *Abbott*, No. 13–51008 (CA5), p. 5 (emphasis added); see also *id.*, at 23–24 ("[T]he evidence established that as a result of the admitting privileges requirement, approximately one-third of the licensed abortion providers in Texas *would stop* providing abortions. . . . As a result, one in three women in Texas *would be unable* to access desired abortion services. . . . [T]he immediate, widespread reduction of services caused by the admitting privileges re-

Agreeing with petitioners, the District Court enjoined enforcement of the requirement on the ground that "there *will be* abortion clinics *that will close.*"  *Abbott*, 951 F. Supp. 2d, at 900 (emphasis added).  The Fifth Circuit found that petitioners' evidence of likely effect was insufficient, stating that petitioners failed to prove that "any woman *will lack* reasonable access to a clinic within Texas." *Abbott*, 748 F. 3d, at 598 (some emphasis added; some emphasis deleted).  The correctness of that holding is irrelevant for present purposes.  What matters is that the "operative fact" in the prior case was the enactment of the admitting privileges requirement, and that is precisely the same operative fact underlying petitioners' facial attack in the case now before us.[3]

## C

In light of this body of authority, how can the Court maintain that the first and second facial claims are really

---

quirement *would produce* a shortfall in the capacity of providers to serve all of the women seeking abortions" (emphasis added)).

[3] Even if the "operative facts" were actual clinic closures, the claims in the two cases would still be the same.  The Court suggests that many clinics closed between the time of the Fifth Circuit's decision in the first case and the time of the District Court's decision in the present case by comparing what the Court of Appeals said in *Abbott* about the effect of the admitting privileges requirement alone, 748 F. 3d, at 598 ("All of the major Texas cities . . . continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges"), with what the District Court said in this case about the combined effect of the admitting privileges requirement and the ambulatory surgical center requirement, 46 F. Supp. 3d 673, 680 (WD Tex. 2014) (Were the surgical center requirement to take effect on September 1, 2014, only seven or eight clinics would remain open).  See *ante*, at 14–15.  Obviously, this comparison does not show that the effect of the admitting privileges requirement alone was greater at the time of the District Court's decision in this second case.  Simply put, the Court presents no new clinic closures allegedly caused by the admitting privileges requirement beyond those already accounted for in *Abbott*, as I discuss, *infra*, at 15–17, and accompanying notes.

two different claims? The Court's first argument is that petitioners did not bring two facial claims because their complaint in the present case sought only as-applied relief and it was the District Court, not petitioners, who injected the issue of facial relief into the case. *Ante*, at 11. (After the District Court gave them statewide relief, petitioners happily accepted the gift and now present their challenge as a facial one. See Reply Brief 24–25 ("[F]acial invalidation is the only way to ensure that the Texas requirements do not extinguish women's liberty").) The thrust of the Court's argument is that a trial judge can circumvent the rules of claim preclusion by granting a plaintiff relief on a claim that the plaintiff is barred from relitigating. Not surprisingly, the Court musters no authority for this proposition, which would undermine the interests that the doctrine of claim preclusion is designed to serve. A "fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive." *Arizona* v. *California*, 460 U. S. 605, 619 (1983). This interest in finality is equally offended regardless of whether the precluded claim is included in a complaint or inserted into the case by a judge.[4]

Another argument tossed off by the Court is that the judgment on the admitting privileges claim in the first case does not have preclusive effect because it was based on "'the prematurity of the action.'" See *ante*, at 11–12 (quoting Restatement (Second) of Judgments §20(2)). But this argument grossly mischaracterizes the basis for the judgment in the first case. The Court of Appeals did not hold that the facial challenge was premature. It held that the evidence petitioners offered was insufficient. See

--------

[4] I need not quibble with the Court's authorities stating that facial relief can sometimes be appropriate even where a plaintiff has requested only as-applied relief. *Ante*, at 15. Assuming that this is generally proper, it does not follow that this may be done where the plaintiff is precluded by res judicata from bringing a facial claim.

*Abbott*, 748 F. 3d, at 598–599; see also n. 9, *infra.* Petitioners could have sought review in this Court, but elected not to do so.

This brings me to the Court's main argument—that the second facial challenge is a different claim because of "changed circumstances." What the Court means by this is that petitioners now have better evidence than they did at the time of the first case with respect to the number of clinics that would have to close as a result of the admitting privileges requirement. This argument is contrary to a cardinal rule of res judicata, namely, that a plaintiff who loses in a first case cannot later bring the same case simply because it has now gathered better evidence. Claim preclusion does not contain a "better evidence" exception. See, *e.g.*, *Torres* v. *Shalala*, 48 F. 3d 887, 894 (CA5 1995) ("If simply submitting new evidence rendered a prior decision factually distinct, *res judicata* would cease to exist"); *Geiger* v. *Foley Hoag LLP Retirement Plan*, 521 F. 3d 60, 66 (CA1 2008) (Claim preclusion "applies even if the litigant is prepared to present different evidence . . . in the second action"); *Saylor* v. *United States*, 315 F. 3d 664, 668 (CA6 2003) ("The fact that . . . new evidence might change the outcome of the case does not affect application of claim preclusion doctrine"); *International Union of Operating Engineers-Employers Constr. Industry Pension, Welfare and Training Trust Funds* v. *Karr*, 994 F. 2d 1426, 1430 (CA9 1993) ("The fact that some different evidence may be presented in this action . . . , however, does not defeat the bar of res judicata"); Restatement (Second) of Judgments §25, Comment *b* ("A mere shift in the evidence offered to support a ground held unproved in a prior action will not suffice to make a new claim avoiding the preclusive effect of the judgment"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4403, p. 33 (2d ed. 2002) (Wright & Miller) (Res judicata "ordinarily applies despite the availability of new evidence"); Restate-

ment of Judgments §1, Comment *b* (The ordinary rules of claim preclusion apply "although the party against whom a judgment is rendered is later in a position to produce better evidence so that he would be successful in a second action").

In an effort to get around this hornbook rule, the Court cites a potpourri of our decisions that have no bearing on the question at issue. Some are not even about res judicata.[5] And the cases that do concern res judicata, *Abie State Bank* v. *Bryan*, 282 U. S. 765, 772 (1931), *Lawlor* v. *National Screen Service Corp.*, 349 U. S. 322, 328 (1955), and *Third Nat. Bank of Louisville* v. *Stone*, 174 U. S. 432, 434 (1899), endorse the unremarkable proposition that a prior judgment does not preclude new claims based on acts occurring after the time of the first judgment.[6] But petitioners' second facial challenge is not based on new acts postdating the first suit. Rather, it is based on the same underlying act, the enactment of H. B. 2, which allegedly posed an undue burden.

I come now to the authority on which the Court chiefly relies, Comment *f* to §24 of the second Restatement. This is how it reads:

> "Material operative facts occurring after the decision
> of an action with respect to the same subject matter

---

[5] See *ante*, at 13 (citing *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153 (1938), and *Nashville, C. & St. L. R. Co.* v. *Walters*, 294 U. S. 405, 415 (1935)).

[6] The Court's contaminated-water hypothetical, see *ante*, at 12–13, may involve such a situation. If after their loss in the first suit, the same prisoners continued to drink the water, they would not be barred from suing to recover for subsequent injuries suffered as a result. But if the Court simply means that the passage of time would allow the prisoners to present better evidence in support of the same claim, the successive suit would be barred for the reasons I have given. In that event, their recourse would be to move for relief from the judgment. See Restatement (Second) of Judgments §73.

.

*may* in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which *may* be made the basis of a second action not precluded by the first. See Illustrations 10–12. Where important human values—such as the lawfulness of a continuing personal disability or restraint—are at stake, even a slight change of circumstances *may* afford a sufficient basis for concluding that a second action may be brought." (Emphasis added.)

As the word I have highlighted—"may"—should make clear, this comment does not say that "[m]aterial operative facts occurring after the decision of an action" always or even usually form "the basis of a second action not precluded by the first." Rather, the comment takes the view that this "may" be so. Accord, *ante*, at 11 ("[D]evelopment of new material facts *can* mean that a new case and an otherwise similar previous case do not present the same claim" (emphasis added)). The question, then, is *when* the development of new material facts should lead to this conclusion. And there are strong reasons to conclude this should be a very narrow exception indeed. Otherwise, this statement, relegated to a mere comment, would revolutionize the rules of claim preclusion—by permitting a party to relitigate a lost claim whenever it obtains better evidence. Comment *f* was surely not meant to upend this fundamental rule.

What the comment undoubtedly means is far more modest—only that in a few, limited circumstances the development of new material facts should (in the opinion of the ALI) permit relitigation. What are these circumstances? Section 24 includes three illustrative examples in the form of hypothetical cases, and none resembles the present case.

In the first hypothetical case, the subsequent suit is based on new events that provide a basis for relief under a

different legal theory. Restatement (Second) of Judgments §24, Illustration 10.

In the second case, a father who lost a prior child custody case brings a second action challenging his wife's fitness as a mother based on "subsequent experience," which I take to mean subsequent conduct by the mother. *Id.*, Illustration 11. This illustration is expressly linked to a determination of a person's "status"—and not even status in general, but a particular status, fitness as a parent, that the law recognizes as changeable. See Reporter's Note, *id.,* §24, Comment *f* (Illustration 11 "exemplifies the effect of changed circumstances in an action relating to status").

In the final example, the government loses a civil antitrust conspiracy case but then brings a second civil antitrust conspiracy case based on new conspiratorial acts. The illustration does not suggest that the legality of acts predating the end of the first case is actionable in the second case, only that the subsequent acts give rise to a new claim and that proof of earlier acts may be admitted as evidence to explain the significance of the later acts. *Id.*, Illustration 12.

The present claim is not similar to any of these illustrations. It does not involve a claim based on postjudgment acts and a new legal theory. It does not ask us to adjudicate a person's status. And it does not involve a continuing course of conduct to be proved by the State's new acts.

The final illustration actually undermines the Court's holding. The Reporter's Note links this illustration to a Fifth Circuit case, *Exhibitors Poster Exchange, Inc.* v. *National Screen Service Corp.*, 421 F. 2d 1313 (1970). In that case, the court distinguished between truly postjudgment acts and "acts which have been completed [prior to the previous judgment] except for their consequences." *Id.,* at 1318. Only postjudgment acts—and not postjudgment consequences—the Fifth Circuit held, can

give rise to a new cause of action.  See *ibid.*[7]

Here, the Court does not rely on any new acts performed by the State of Texas after the end of the first case.  Instead, the Court relies solely on what it takes to be new consequences, the closing of additional clinics, that are said to have resulted from the enactment of H. B. 2.

## D

For these reasons, what the Court has done here is to create an entirely new exception to the rule that a losing plaintiff cannot relitigate a claim just because it now has new and better evidence.  As best I can tell, the Court's new rule must be something like this: If a plaintiff initially loses because it failed to provide adequate proof that a challenged law will have an unconstitutional effect and if subsequent developments tend to show that the law will in fact have those effects, the plaintiff may relitigate the same claim.  Such a rule would be unprecedented, and I am unsure of its wisdom, but I am certain of this: There is no possible justification for such a rule unless the plaintiff, at the time of the first case, could not have reasonably shown what the effects of the law would be.  And that is not the situation in this case.

## 1

The Court does not contend that petitioners, at the time

_____

[7] See also *Sutliffe* v. *Epping School Dist.*, 584 F. 3d 314, 328 (CA1 2009) ("[W]hen a defendant is accused of . . . acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action, and the events are said to constitute but one transaction" (internal quotation marks omitted)); *Monahan* v. *New York City Dept. of Corrections*, 214 F. 3d 275, 289 (CA2 2000) ("Plaintiffs' assertion of new incidents arising from the application of the challenged policy is also insufficient to bar the application of *res judicata*"); *Huck* v. *Dawson*, 106 F. 3d 45, 49 (CA3 1997) (applying res judicata where "the same facts that resulted in the earlier judgment have caused continued damage").

of the first case, could not have gathered and provided evidence that was sufficient to show that the admitting privileges requirement *would cause* a sufficient number of clinic closures. Instead, the Court attempts to argue that petitioners could not have shown at that time that a sufficient number of clinics *had already closed*. As I have explained, that is not what petitioners need to show or what they attempted to prove.

Moreover, the Court is also wrong in its understanding of petitioners' proof in the first case. In support of its holding that the admitting privileges requirement now "places a 'substantial obstacle in the path of a woman's choice,'" the Court relies on two facts: "Eight abortion clinics closed in the months leading up to the requirement's effective date" and "[e]leven more closed on the day the admitting-privileges requirement took effect." *Ante*, at 24. But petitioners put on evidence addressing exactly this issue in their first trial. They apparently surveyed 27 of the 36 abortion clinics they identified in the State, including all 24 of the clinics owned by them or their coplaintiffs, to find out what impact the requirement would have on clinic operations. See Appendix, *infra* (App. K to Emergency Application To Vacate Stay in *Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, O. T. 2013, No. 13A452, Plaintiffs' Trial Exh. 46).

That survey claimed to show that the admitting privileges requirement would cause 15 clinics to close.[8] See *ibid.* The Fifth Circuit had that evidence before it, and did not refuse to consider it.[9] If that evidence was sufficient to

——————
[8] As I explain, *infra*, at 29, and n. 18, some of the closures presumably included in the Court's count of 19 were not attributed to H. B. 2 at the first trial, even by petitioners.

[9] The *Abbott* panel's refusal to consider "developments since the conclusion of the bench trial," 748 F. 3d, at 599, n. 14, was not addressed to the evidence of 15 closures presented at trial. The Court of Appeals in

show that the admitting privileges rule created an unlaw-
ful impediment to abortion access (and the District Court
indeed thought it sufficient), then the decision of the Fifth
Circuit in the first case was wrong as a matter of law.
Petitioners could have asked us to review that decision,
but they chose not to do so. A tactical decision of that
nature has consequences. While it does not mean that the

––––––––

fact credited that evidence by *assuming* "some clinics may be required
to shut their doors," but it nevertheless concluded that "there is no
showing whatsoever that *any* woman will lack reasonable access to a
clinic within Texas." *Id.,* at 598. The *Abbott* decision therefore accepted
the factual premise common to these two actions—namely, that the
admitting privileges requirement would cause some clinics to close—
but it concluded that petitioners had not proved a burden on access
regardless. In rejecting *Abbott*'s conclusion, the Court seems to believe
that *Abbott* also must have refused to accept the factual premise. See
*ante*, at 13–15.

Instead, *Abbott*'s footnote 14 appears to have addressed the following
post-trial developments: (1) the permanent closure of the Lubbock
clinic, Brief for Plaintiffs-Appellees in *Abbott* (CA5), at 5, n. 3 (accounted
for among the 15 anticipated closures, see Appendix, *infra*); (2) the
*resumption* of abortion services in Fort Worth, Brief for Plaintiffs-
Appellees, at 5, n. 3; (3) the *acquisition* of admitting privileges by an
Austin abortion provider, *id.,* at 6, n. 4; (4) the *acquisition* of privileges
by physicians in Dallas and San Antonio, see Letter from J. Crepps to
L. Cayce, Clerk of Court in *Abbott* (CA5, Jan. 3, 2014); (5) the *acquisi-
tion* of privileges by physicians in El Paso and Killeen, see Letter from
J. Crepps to L. Cayce, Clerk of Court in *Abbott* (CA5, Mar. 21, 2014);
and (6) the enforcement of the requirement against one Houston
provider who lacked privileges, see *ibid.* (citing Texas Medical Board
press release). In the five months between the admitting privileges
requirement taking effect and the Fifth Circuit's *Abbott* decision, then,
the parties had ample time to inform that court of post-trial develop-
ments—and petitioners never identified the 15 closures as new (be-
cause the closures were already accounted for in their trial evidence).
In fact, the *actual* new developments largely favored the State's case: In
that time, physicians in Austin, Dallas, El Paso, Fort Worth, Killeen,
and San Antonio were able to come into compliance, while only one in
Houston was not, and one clinic (already identified at trial as expected
to close) closed permanently. So *Abbott*'s decision to ignore post-trial
developments quite likely favored petitioners.

admitting privileges requirement is immune to a facial challenge, it does mean that these petitioners and the other plaintiffs in the first case cannot mount such a claim.

### 2

Even if the Court thinks that petitioners' evidence in the first case was insufficient, the Court does not claim that petitioners, with reasonable effort, could not have gathered sufficient evidence to show with some degree of accuracy what the effects of the admitting privileges requirement would be. As I have just explained, in their first trial petitioners introduced a survey of 27 abortion clinics indicating that 15 would close because of the admitting privileges requirement. The Court does not identify what additional evidence petitioners needed but were unable to gather. There is simply no reason why petitioners should be allowed to relitigate their facial claim.

### E

So far, I have discussed only the first of the two sentences in Comment *f*, but the Court also relies on the second sentence. I reiterate what that second sentence says:

> "Where important human values—such as the lawfulness of a continuing personal disability or restraint—are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought." Restatement (Second) of Judgments §24, Comment *f*.

The second Restatement offers no judicial support whatsoever for this suggestion, and thus the comment "must be regarded as a proposal for change rather than a restatement of existing doctrine, since the commentary refers to not a single case, of this or any other United States court." *United States* v. *Stuart*, 489 U. S. 353, 375 (1989) (Scalia,

J., concurring in judgment). The sentence also sits in considerable tension with our decisions stating that res judicata must be applied uniformly and without regard to what a court may think is just in a particular case. See, *e.g.*, *Moitie*, 452 U. S., at 401 ("The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case"). Not only did this sentence seemingly come out of nowhere, but it appears that no subsequent court has relied on this sentence as a ground for decision. And while a few decisions have cited the "important human values" language, those cases invariably involve the relitigation of personal status determinations, as discussed in Comment *f*'s Illustration 11. See, *e.g., People ex rel. Leonard HH.* v. *Nixon*, 148 App. Div. 2d 75, 79–80, 543 N. Y. S. 2d 998, 1001 (1989) ("[B]y its very nature, litigation concerning the *status* of a person's mental capacity does not lend itself to strict application of res judicata on a transactional analysis basis").[10]

\*   \*   \*

In sum, the Court's holding that petitioners' second facial challenge to the admitting privileges requirement is not barred by claim preclusion is not supported by any of

---

[10] See also *In re Marriage of Shaddle*, 317 Ill. App. 3d 428, 430–432, 740 N. E. 2d 525, 528–529 (2000) (child custody); *In re Hope M.*, 1998 ME 170, ¶5, 714 A. 2d 152, 154 (termination of parental rights); *In re Connors*, 255 Ill. App. 3d 781, 784–785, 627 N. E. 2d 1171, 1173–1174 (1994) (civil commitment); *Kent V.* v. *State*, 233 P. 3d 597, 601, and n. 12 (Alaska 2010) (applying Comment *f* to termination of parental rights); *In re Juvenile Appeal (83–DE)*, 190 Conn. 310, 318–319, 460 A. 2d 1277, 1282 (1983) (same); *In re Strozzi*, 112 N. M. 270, 274, 814 P. 2d 138, 142 (App. 1991) (guardianship and conservatorship); *Andrulonis* v. *Andrulonis*, 193 Md. App. 601, 617, 998 A. 2d 898, 908 (2010) (modification of alimony); *In re Marriage of Pedersen*, 237 Ill. App. 3d 952, 957, 605 N. E. 2d 629, 633 (1992) (same); *Friederwitzer* v. *Friederwitzer*, 55 N. Y. 2d 89, 94–95, 432 N. E. 2d 765, 768 (1982) (child custody).

our cases or any body of lower court precedent; is contrary to the bedrock rule that a party cannot relitigate a claim simply because the party has obtained new and better evidence; is contrary to the first Restatement of Judgments and the actual rules of the second Restatement of Judgment; and is purportedly based largely on a single comment in the second Restatement, but does not even represent a sensible reading of that comment. In a regular case, an attempt by petitioners to relitigate their previously unsuccessful facial challenge to the admitting privileges requirement would have been rejected out of hand—indeed, might have resulted in the imposition of sanctions under Federal Rule of Civil Procedure 11. No court would even think of reviving such a claim on its own. But in this abortion case, ordinary rules of law—and fairness—are suspended.

## II
### A

I now turn to the application of principles of claim preclusion to a claim that petitioners did include in their second complaint, namely, their facial challenge to the requirement in H. B. 2 that abortion clinics comply with the rules that govern ambulatory surgical centers (ASCs). As we have said many times, the doctrine of claim preclusion not only bars the relitigation of previously litigated claims; it can also bar claims that are closely related to the claims unsuccessfully litigated in a prior case. See *Moitie*, *supra*, at 398; *Montana*, 440 U. S., at 153.

As just discussed, the Court's holding on the admitting privileges issue is based largely on a comment to §24 of the second Restatement, and therefore one might think that consistency would dictate an examination of what §24 has to say on the question whether the ASC challenge should be barred. But consistency is not the Court's watchword here.

Section 24 sets out the general rule regarding the "'[s]plitting'" of claims. This is the rule that determines when the barring of a claim that was previously litigated unsuccessfully also extinguishes a claim that the plaintiff could have but did not bring in the first case. Section 24(1) states that the new claim is barred if it is "any part of the transaction, or series of connected transactions, out of which the action arose."

Here, it is evident that petitioners' challenges to the admitting privileges requirement and the ASC requirement are part of the same transaction or series of connected transactions. If, as I believe, the "transaction" is the enactment of H. B. 2, then the two facial claims are part of the very same transaction. And the same is true even if the likely or actual effects of the two provisions constitute the relevant transactions. Petitioners argue that the admitting privileges requirement and the ASC requirements *combined* have the effect of unconstitutionally restricting access to abortions. Their brief repeatedly refers to the collective effect of the "requirements." Brief for Petitioners 40, 41, 42, 43, 44. They describe the admitting privileges and ASC requirements as delivering a "one-two punch." *Id.*, at 40. They make no effort whatsoever to separate the effects of the two provisions.

B

The Court nevertheless holds that there are two "meaningful differences" that justify a departure from the general rule against splitting claims. *Ante*, at 16. Neither has merit.

1

First, pointing to a statement in a pocket part to a treatise, the Court says that "courts normally treat challenges to distinct regulatory requirements as 'separate claims,' even when they are part of one overarching '[g]overnment

regulatory scheme.'" *Ante*, at 16–17 (quoting 18 Wright & Miller §4408, at 54 (2d ed. 2002, Supp. 2016)). As support for this statement, the treatise cites one case, *Hamilton's Bogarts, Inc.* v. *Michigan*, 501 F. 3d 644, 650 (CA6 2007). Even if these authorities supported the rule invoked by the Court (and the Court points to no other authorities), they would hardly be sufficient to show that "courts normally" proceed in accordance with the Court's rule. But in fact neither the treatise nor the Sixth Circuit decision actually supports the Court's rule.

What the treatise says is the following:

> "Government *regulatory schemes* provide regular examples of circumstances in which regulation of a single business by many different provisions *should lead* to recognition of separate claims when the business challenges different regulations." 18 Wright & Miller §4408, at 54 (emphasis added).

Thus, the treatise expresses a view about what the law "should" be; it does not purport to state what courts "normally" do. And the recommendation of the treatise authors concerns different provisions of a "regulatory scheme," which often embodies an accumulation of legislative enactments. Petitioners challenge two provisions of one law, not just two provisions of a regulatory scheme.

The Sixth Circuit decision is even further afield. In that case, the plaintiff had previously lost a case challenging one rule of a state liquor control commission. 501 F. 3d, at 649–650. On the question whether the final judgment in that case barred a subsequent claim attacking another rule, the court held that the latter claim was "likely" not barred because, "although [the first rule] was challenged in the first lawsuit, [the other rule] was not," and "[t]he state has not argued or made any showing that [the party] should also have challenged [the other rule] at the time." *Id.,* at 650. To say that these authorities provide

meager support for the Court's reasoning would be an exaggeration.

Beyond these paltry authorities, the Court adds only the argument that we should not "encourage a kitchen-sink approach to any litigation challenging the validity of statutes." *Ante*, at 17. I agree—but that is not the situation in this case. The two claims here are very closely related. They are two parts of the same bill. They both impose new requirements on abortion clinics. They are justified by the State on the same ground, protection of the safety of women seeking abortions. They are both challenged as imposing the same kind of burden (impaired access to clinics) on the same kind of right (the right to abortion, as announced in *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Casey*, 505 U. S. 833). And petitioners attack the two provisions as a package. According to petitioners, the two provisions were both enacted for the same illegitimate purpose—to close down Texas abortion clinics. See Brief for Petitioners 35–36. And as noted, petitioners rely on the combined effect of the two requirements. Petitioners have made little effort to identify the clinics that closed as a result of each requirement but instead aggregate the two requirements' effects.

For these reasons, the two challenges "form a convenient trial unit." Restatement (Second) of Judgments §24(2). In fact, for a trial court to accurately identify the effect of each provision it would also need to identify the effect of the other provision. Cf. *infra*, at 30.

2

Second, the Court claims that, at the time when petitioners filed their complaint in the first case, they could not have known whether future rules implementing the surgical center requirement would provide an exemption for existing abortion clinics. *Ante*, at 17. This argument is deeply flawed.

"Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 143 (1974). And here, there was never any real chance that the Texas Department of State Health Services would exempt existing abortion clinics from all the ASC requirements. As the Court of Appeals wrote, "it is abundantly clear from H. B. 2 that all abortion facilities must meet the standards already promulgated for ASCs." *Whole Woman's Health* v. *Cole,* 790 F. 3d 563, 583 (2015) (*per curiam*) (case below). See Tex. Health & Safety Code Ann. §245.010(a) (West Cum. Supp. 2015) (Rules implementing H. B. 2 "must contain minimum standards . . . for an abortion facility [that are] equivalent to the minimum standards . . . for ambulatory surgical centers"). There is no apparent basis for the argument that H. B. 2 permitted the state health department to grant blanket exemptions.

Whether there was any real likelihood that clinics would be exempted from *particular* ASC requirements is irrelevant because both petitioners and the Court view the ASC requirements as an indivisible whole. Petitioners told the Fifth Circuit in unequivocal terms that they were "challeng[ing] H. B. 2 broadly, with no effort whatsoever to parse out specific aspects of the ASC requirement that they f[ou]nd onerous or otherwise infirm." 790 F. 3d, at 582. Similarly, the majority views all the ASC provisions as an indivisible whole. See *ante*, at 38 ("The statute was meant to require abortion facilities to meet the integrated surgical-center standards—not some subset thereof"). On this view, petitioners had no reason to wait to see whether the Department of State Health Services might exempt them from some of the ASC rules. Even if exemptions from some of the ASC rules had been granted, petitioners and the majority would still maintain that the provision of

H. B. 2 making the ASC rules applicable to abortion facilities is facially unconstitutional. Thus, exemption from some of the ASC requirements would be entirely inconsequential. The Court has no response to this point. See *ante*, at 17.

For these reasons, petitioners' facial attack on the ASC requirements, like their facial attack on the admitting privileges rule, is precluded.

## III

Even if res judicata did not bar either facial claim, a sweeping, statewide injunction against the enforcement of the admitting privileges and ASC requirements would still be unjustified. Petitioners in this case are abortion clinics and physicians who perform abortions. If they were simply asserting a constitutional right to conduct a business or to practice a profession without unnecessary state regulation, they would have little chance of success. See, *e.g., Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483 (1955). Under our abortion cases, however, they are permitted to rely on the right of the abortion patients they serve. See *Doe* v. *Bolton*, 410 U. S. 179, 188 (1973); but see *ante*, at 2–5 (THOMAS, J., dissenting).

Thus, what matters for present purposes is not the effect of the H. B. 2 provisions on petitioners but the effect on their patients. Under our cases, petitioners must show that the admitting privileges and ASC requirements impose an "undue burden" on women seeking abortions. *Gonzales* v. *Carhart*, 550 U. S. 124, 146 (2007). And in order to obtain the sweeping relief they seek—facial invalidation of those provisions—they must show, at a minimum, that these provisions have an unconstitutional impact on at least a "large fraction" of Texas women of reproductive age.[11]  *Id.,* at 167–168. Such a situation

---

[11] The proper standard for facial challenges is unsettled in the abor-

could result if the clinics able to comply with the new requirements either lacked the requisite overall capacity or were located too far away to serve a "large fraction" of the women in question.

Petitioners did not make that showing. Instead of offering direct evidence, they relied on two crude inferences. First, they pointed to the number of abortion clinics that closed after the enactment of H. B. 2, and asked that it be inferred that all these closures resulted from the two challenged provisions. See Brief for Petitioners 23–24. They made little effort to show why particular clinics closed. Second, they pointed to the number of abortions performed annually at ASCs before H. B. 2 took effect and, because this figure is well below the total number of abortions performed each year in the State, they asked that it be inferred that ASC-compliant clinics could not meet the demands of women in the State. See App. 237–238. Peti-

————————

tion context. See *Gonzales*, 550 U. S., at 167–168 (comparing *Ohio* v. *Akron Center for Reproductive Health*, 497 U. S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that no set of circumstances exists under which the Act would be valid" (internal quotation marks omitted)), with *Casey*, 505 U. S., at 895 (opinion of the Court) (indicating a spousal-notification statute would impose an undue burden "in a large fraction of the cases in which [it] is relevant" and holding the statutory provision facially invalid)). Like the Court in *Gonzales*, *supra,* at 167–168, I do not decide the question, and use the more plaintiff-friendly "large fraction" formulation only because petitioners cannot meet even that test.

The Court, by contrast, applies the "large fraction" standard without even acknowledging the open question. *Ante*, at 39. In a similar vein, it holds that the fraction's "relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" *Ibid.* (quoting *Casey*, 505 U. S., at 895). I must confess that I do not understand this holding. The purpose of the large-fraction analysis, presumably, is to compare the number of women *actually* burdened with the number *potentially* burdened. Under the Court's holding, we are supposed to use the same figure (women actually burdened) as both the numerator and the denominator. By my math, that fraction is always "1," which is pretty large as fractions go.

tioners failed to provide any evidence of the actual capacity of the facilities that would be available to perform abortions in compliance with the new law—even though they provided this type of evidence in their first case to the District Court at trial and then to this Court in their application for interim injunctive relief. Appendix, *infra.*

A

I do not dispute the fact that H. B. 2 caused the closure of some clinics. Indeed, it seems clear that H. B. 2 was intended to force unsafe facilities to shut down. The law was one of many enacted by States in the wake of the Kermit Gosnell scandal, in which a physician who ran an abortion clinic in Philadelphia was convicted for the first-degree murder of three infants who were born alive and for the manslaughter of a patient. Gosnell had not been actively supervised by state or local authorities or by his peers, and the Philadelphia grand jury that investigated the case recommended that the Commonwealth adopt a law requiring abortion clinics to comply with the same regulations as ASCs.[12] If Pennsylvania had had such a requirement in force, the Gosnell facility may have been shut down before his crimes. And if there were any similarly unsafe facilities in Texas, H. B. 2 was clearly intended to put them out of business.[13]

––––––––––

[12] Report of Grand Jury in No. 0009901–2008 (1st Jud. Dist. Pa., Jan. 14, 2011), p. 248–249, online at http://www.phila.gov/districtattorney/pdfs/grandjurywomensmedical.pdf (all Internet materials as last visited June 24, 2016).

[13] See House Research Org., Laubenberg et al., Bill Analysis 10 (July 9, 2013), online at http://www.hro.house.state.tx.us/pdf/ba832/hb0002.pdf ("Higher standards could prevent the occurrence of a situation in Texas like the one recently exposed in Philadelphia, in which Dr. Kermit Gosnell was convicted of murder after killing babies who were born alive. A patient also died at that substandard clinic"). The Court attempts to distinguish the Gosnell horror story by pointing

While there can be no doubt that H. B. 2 caused some clinics to cease operation, the absence of proof regarding the reasons for particular closures is a problem because some clinics have or may have closed for at least four reasons other than the two H. B. 2 requirements at issue here. These are:

> 1. *H. B. 2's restriction on medication abortion.* In their first case, petitioners challenged the provision of H. B. 2 that regulates medication abortion, but that part of the statute was upheld by the Fifth Circuit and not relitigated in this case. The record in this case indicates that in the first six months after this restriction took effect, the number of medication abortions dropped by 6,957 (compared to the same period the previous year). App. 236.
> 2. *Withdrawal of Texas family planning funds.* In 2011, Texas passed a law preventing family planning grants to providers that perform abortions and their affiliates. In the first case, petitioners' expert admitted that some clinics closed "as a result of the defunding,"[14] and as discussed below, this withdrawal appears specifically to have caused multiple clinic closures in West Texas. See *infra*, at 29, and n. 18.
> 3. *The nationwide decline in abortion demand.* Petitioners' expert testimony relies[15] on a study from the Guttmacher Institute which concludes that "'[t]he national abortion rate has resumed its decline, and *no evidence was found that the overall drop in abortion incidence was related to the decrease in providers or to*

–––––––––
to differences between Pennsylvania and Texas law. See *ante*, at 27–28. But Texas did not need to be in Pennsylvania's precise position for the legislature to rationally conclude that a similar law would be helpful.

[14] Rebuttal Decl. of Dr. Joseph E. Potter, Doc. 76–2, p. 12, ¶32, in *Abbott* (WD Tex., Oct. 18, 2013) (Potter Rebuttal Decl.).

[15] See App. 234, 237, 253.

*restrictions implemented between 2008 and 2011*.'" App. 1117 (direct testimony of Dr. Peter Uhlenberg) (quoting R. Jones & J. Jerman, Abortion Incidence and Service Availability In the United States, 2011, 46 Perspectives on Sexual and Reproductive Health 3 (2014); emphasis in testimony). Consistent with that trend, "[t]he number of abortions to residents of Texas declined by 4,956 between 2010 and 2011 and by 3,905 between 2011 and 2012." App. 1118.

4. *Physician retirement (or other localized factors).* Like everyone else, most physicians eventually retire, and the retirement of a physician who performs abortions can cause the closing of a clinic or a reduction in the number of abortions that a clinic can perform. When this happens, the closure of the clinic or the reduction in capacity cannot be attributed to H. B. 2 unless it is shown that the retirement was caused by the admitting privileges or surgical center requirements as opposed to age or some other factor.

At least nine Texas clinics may have ceased performing abortions (or reduced capacity) for one or more of the reasons having nothing to do with the provisions challenged here. For example, in their first case, petitioners alleged that the medication-abortion restriction would cause at least three medication-only abortion clinics to cease performing abortions,[16] and they predicted that "[o]ther facilities that offer both surgical and medication abortion will be unable to offer medication abortion,"[17] presumably reducing their capacity. It also appears that several clinics (including most of the clinics operating in West Texas, apart from El Paso) closed in response to the

_____

[16] Complaint and Application for Preliminary and Permanent Injunction in *Abbott* (WD Tex.)*,* ¶¶10, 11 (listing one clinic in Stafford and two in San Antonio).

[17] *Id.*, ¶88.

unrelated law restricting the provision of family planning funds.[18]  And there is reason to question whether at least two closures (one in Corpus Christi and one in Houston) may have been prompted by physician retirements.[19]

Neither petitioners nor the District Court properly addressed these complexities in assessing causation—and for no good reason.  The total number of abortion clinics in the State was not large.  Petitioners could have put on evidence (as they did for 27 individual clinics in their first case, see Appendix, *infra*) about the challenged provisions' role in causing the closure of each clinic,[20] and the court could have made a factual finding as to the cause of each

—————

[18] In the first case, petitioners apparently did not even believe that the abortion clinics in Abilene, Bryan, Midland, and San Angelo were made to close because of H. B. 2.  In that case, petitioners submitted a list of 15 clinics they believed would close (or have severely limited capacity) because of the admitting privileges requirement—and those four West Texas clinics are *not* on the list.  See Appendix, *infra*.  And at trial, a Planned Parenthood executive specifically testified that the Midland clinic closed because of the funding cuts and because the clinic's medical director retired.  See 1 Tr. 91, 93, in *Abbott* (WD Tex., Oct. 21, 2013).  Petitioners' list and Planned Parenthood's testimony both fit with petitioners' expert's admission in the first case that some clinics closed "as a result of the defunding."  Potter Rebuttal Decl. ¶32.

[19] See Stoelje, Abortion Clinic Closes in Corpus Christi, San Antonio Express-News (June 10, 2014), online at http://www.mysanantonio.com/ news/local/ article/Abortion-clinic-closes-in-Corpus-Christi-5543125.php (provider "retiring for medical reasons"); 1 Plaintiffs' Exh. 18, p. 2, in *Whole Woman's Health* v. *Lakey*, No. 1:14–cv–284 (WD Tex., admitted into evidence Aug. 4, 2014) (e-mail stating Houston clinic owner "is retiring his practice").  Petitioners should have been required to put on proof about the reason for the closure of particular clinics.  I cite the extrarecord Corpus Christi story only to highlight the need for such proof.

[20] This kind of evidence was readily available; in fact, petitioners deposed at least one nonparty clinic owner about the burden posed by H. B. 2.  See App. 1474.  And recall that in their first case, petitioners put on evidence purporting to show how the admitting privileges requirement would (or would not) affect 27 clinics.  See Appendix, *infra* (petitioners' chart of clinics).

closure.

Precise findings are important because the key issue here is not the number or percentage of clinics affected, but the effect of the closures on women seeking abortions, *i.e.*, on the capacity and geographic distribution of clinics used by those women. To the extent that clinics closed (or experienced a reduction in capacity) for any reason unrelated to the challenged provisions of H. B. 2, the corresponding burden on abortion access may not be factored into the access analysis. Because there was ample reason to believe that some closures were caused by these other factors, the District Court's failure to ascertain the reasons for clinic closures means that, on the record before us, there is no way to tell which closures actually count. Petitioners—who, as plaintiffs, bore the burden of proof—cannot simply point to temporal correlation and call it causation.

B

Even if the District Court had properly filtered out immaterial closures, its analysis would have been incomplete for a second reason. Petitioners offered scant evidence on the capacity of the clinics that are able to comply with the admitting privileges and ASC requirements, or on those clinics' geographic distribution. Reviewing the evidence in the record, it is far from clear that there has been a material impact on access to abortion.

On clinic capacity, the Court relies on petitioners' expert Dr. Grossman, who compared the number of abortions performed at Texas ASCs before the enactment of H. B. 2 (about 14,000 per year) with the total number of abortions per year in the State (between 60,000–70,000 per year). *Ante*, at 32–33.[21] Applying what the Court terms "common

--------

[21] In the first case, petitioners submitted a report that Dr. Grossman coauthored with their testifying expert, Dr. Potter. 1 Tr. 38 in *Lakey* (Aug. 4, 2014) (*Lakey* Tr.). That report predicted that "the shortfall in

sense," the Court infers that the ASCs that performed abortions at the time of H. B. 2's enactment lacked the capacity to perform all the abortions sought by women in Texas.

The Court's inference has obvious limitations. First, it is not unassailable "common sense" to hold that current utilization equals capacity; if all we know about a grocery store is that it currently serves 200 customers per week, *ante*, at 33, that fact alone does not tell us whether it is an

_____

capacity due to the admitting privileges requirement will prevent at least 22,286 women" from accessing abortion. Decl. of Dr. Joseph E. Potter, Doc. 9–8, p. 4, in *Abbott* (WD Tex., Oct. 1, 2013). The methodology used was questionable. See Potter Rebuttal Decl. ¶18. As Dr. Potter admitted: "There's no science there. It's just evidence." 2 Tr. 23 in *Abbott* (WD Tex., Oct. 22, 2013). And in this case, in fact, Dr. Grossman admitted that their prediction turned out to be wildly inaccurate. Specifically, he provided a new figure (approximately 9,200) that was less than half of his earlier prediction. 1 *Lakey* Tr. 41. And he then admitted that he had not proven any causal link between the admitting privileges requirement and that smaller decline. *Id.,* at 54 (quoting Grossman et al., Change in Abortion Services After Implementation of a Restrictive Law in Texas, 90 Contraception 496, 500 (2014)).

Dr. Grossman's testimony in this case, furthermore, suggested that H. B. 2's restriction on medication abortion (whose impact on clinics cannot be attributed to the provisions challenged in this case) was a major cause in the decline in the abortion rate. After the medication abortion restriction and admitting privileges requirement took effect, over the next six months the number of medication abortions dropped by 6,957 compared to the same period in the previous year. See App. 236. The corresponding number of surgical abortions rose by 2,343. See *ibid.* If that net decline of 4,614 in six months is doubled to approximate the annual trend (which is apparently the methodology Dr. Grossman used to arrive at his 9,200 figure, see 90 Contraception, *supra*, at 500), then the year's drop of 9,228 abortions seems to be *entirely* the product of the medication abortion restriction. Taken together, these figures make it difficult to conclude that the admitting privileges requirement actually depressed the abortion rate *at all*.

In light of all this, it is unclear why the Court takes Dr. Grossman's testimony at face value.

overcrowded minimart or a practically empty supermarket. Faced with increased demand, ASCs could potentially increase the number of abortions performed without prohibitively expensive changes. Among other things, they might hire more physicians who perform abortions,[22] utilize their facilities more intensively or efficiently, or shift the mix of services provided. Second, what matters for present purposes is not the capacity of just those ASCs that performed abortions prior to the enactment of H. B. 2 but the capacity of those that would be available to perform abortions after the statute took effect. And since the enactment of H. B. 2, the number of ASCs performing abortions has increased by 50%—from six in 2012 to nine today.[23]

The most serious problem with the Court's reasoning is that its conclusion is belied by petitioners' own submissions to this Court. In the first case, when petitioners asked this Court to vacate the Fifth Circuit's stay of the District Court's injunction of the admitting privileges

---

[22] The Court asserts that the admitting privileges requirement is a bottleneck on capacity, *ante*, at 34, but it musters no evidence and does not even dispute petitioners' own evidence that the admitting privileges requirement may have had *zero* impact on the Texas abortion rate, n. 21, *supra*.

[23] See Brief for Petitioners 23–24 (six centers in 2012, compared with nine today). Two of the three new surgical centers opened since this case was filed are operated by Planned Parenthood (which now owns five of the nine surgical centers in the State). See App. 182–183, 1436. Planned Parenthood is obviously able to comply with the challenged H. B. 2 requirements. The president of petitioner Whole Woman's Health, a much smaller entity, has complained that Planned Parenthood "'put[s] local independent businesses in a tough situation.'" Simon, Planned Parenthood Hits Suburbia, Wall Street Journal Online (June 23, 2008) (cited in Brief for CitizenLink et al. as *Amici Curiae* 15–16, and n. 23). But as noted, petitioners in this case are not asserting their own rights but those of women who wish to obtain an abortion, see *supra*, at 24, and thus the effect of the H. B. 2 requirements on petitioners' business and professional interests are not relevant.

requirement pending appeal, they submitted a chart previously provided in the District Court that detailed the capacity of abortion clinics after the admitting privileges requirement was to take effect.[24]  This chart is included as an Appendix to this opinion.[25]  Three of the facilities listed on the chart were ASCs, and their capacity was shown as follows:

- Southwestern Women's Surgery Center in Dallas was said to have the capacity for 5,720 abortions a year (110 per week);
- Planned Parenthood Surgical Health Services Center in Dallas was said to have the capacity for 6,240 abortions a year (120 per week); and

———————

[24] See Appendix, *infra*.  The Court apparently brushes off this evidence as "outside the record," *ante*, at 35, but it was filed with this Court by the same petitioners in litigation closely related to this case.  And "we may properly take judicial notice of the record in that litigation between the same parties who are now before us." *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 157 (1969); see also, *e.g.*, *United States* v. *Pink*, 315 U. S. 203, 216 (1942); *Freshman* v. *Atkins*, 269 U. S. 121, 124 (1925).

[25] The chart lists the 36 abortion clinics apparently open at the time of trial, and identifies the "Capacity after Privileges Requirement" for 27 of those clinics.  Of those 27 clinics, 24 were owned by plaintiffs in the first case, and 3 (Coastal Birth Control Center, Hill Top Women's Reproductive Health Services, and Harlingen Reproductive Services) were owned by nonparties.  It is unclear why petitioners' chart did not include capacity figures for the other nine clinics (also owned by non-parties).  Under Federal Rule of Civil Procedure 30(b)(6), petitioners should have been able to depose representatives of those clinics to determine those clinics' capacity and their physicians' access to admitting privileges.  In the present case, petitioners in fact deposed at least one such nonparty clinic owner, whose testimony revealed that he was able to comply with the admitting privileges requirement.  See App. 1474 (testimony of El Paso abortion clinic owner, confirming that he possesses admitting privileges "at every hospital in El Paso" (filed under seal)).  The chart states that 14 of those clinics would not be able to perform abortions if the requirement took effect, and that another clinic would have "severely limited" capacity.  See Appendix, *infra*.

- Planned Parenthood Center for Choice in Houston was said to have the capacity for 9,100 abortions a year (175 per week).[26]  See Appendix, *infra.*

The average capacity of these three ASCs was 7,020 abortions per year.[27]  If the nine ASCs now performing abortions in Texas have the same average capacity, they have a total capacity of 63,180.  Add in the assumed capacity for two other clinics that are operating pursuant to the judgment of the Fifth Circuit (over 3,100 abortions per year),[28] and the total for the State is 66,280 abortions per year.  That is comparable to the 68,298 total abortions performed in Texas in 2012, the year before H. B. 2 was enacted, App. 236,[29] and well in excess of the abortion rate

--------

[26] The Court nakedly asserts that this clinic "does not represent most facilities."  *Ante*, at 35.  Given that in this case petitioners did not introduce evidence on "most facilities," I have no idea how the Court arrives at this conclusion.

[27] The Court chides me, *ante*, at 35, for omitting the Whole Woman's Health ASC in San Antonio from this average.  As of the *Abbott* trial in 2013, that ASC's capacity was (allegedly) to be "severely limited" by the admitting privileges requirement.  See Appendix, *infra* (listing "Capacity after Privileges Requirement").  But that facility came into compliance with that requirement a few months later, see Letter from J. Crepps to L. Cayce, Clerk of Court in *Abbott* (CA5, Jan. 3, 2014), so its precompliance capacity is irrelevant here.

[28] Petitioner Whole Woman's Health performed over 14,000 abortions over 10 years in McAllen.  App. 128.  Petitioner Nova Health Systems performed over 17,000 abortions over 10 years in El Paso.  *Id.,* at 129.  (And as I explain at n. 33, *infra*, either Nova Health Systems or another abortion provider will be open in the El Paso area however this case is decided.)

[29] This conclusion is consistent with public health statistics offered by petitioners. These statistics suggest that ASCs have a much higher capacity than other abortion facilities.  In 2012, there were 14,361 abortions performed by six surgical centers, meaning there were 2,394 abortions per center.  See Brief for Petitioners 23; App. 236.  In 2012, there were approximately 35 other abortion clinics operating in Texas, see *id.,* at 228 (41 total clinics as of Nov. 1, 2012), which performed 53,937 abortions, *id.,* at 236 (68,298 total minus 14,361 performed in surgical centers).  On average, those other clinics each performed

one would expect—59,070—if subtracting the apparent impact of the medication abortion restriction, see n. 21, *supra.*

To be clear, I do not vouch for the accuracy of this calculation. It might be too high or too low. The important point is that petitioners put on evidence of actual clinic capacity in their earlier case, and there is no apparent reason why they could not have done the same here. Indeed, the Court asserts that, after the admitting privileges requirement took effect, clinics "were not able to accommodate increased demand," *ante*, at 35, but petitioners' own evidence suggested that the requirement had *no* effect on capacity, see n. 21, *supra.* On this point, like the question of the reason for clinic closures, petitioners did not discharge their burden, and the District Court did not engage in the type of analysis that should have been conducted before enjoining an important state law.

So much for capacity. The other[30] potential obstacle to abortion access is the distribution of facilities throughout the State. This might occur if the two challenged H. B. 2 requirements, by causing the closure of clinics in some rural areas, led to a situation in which a "large fraction"[31] of women of reproductive age live too far away from any open clinic. Based on the Court's holding in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, it appears that the need to travel up to 150 miles is not an undue burden,[32] and the evidence in this case shows that

—————

53,937÷35=1,541 abortions per year. So surgical centers in 2012 performed 55% more abortions per facility (2,394 abortions) than the average (1,541) for other clinics.

[30] The Court also gives weight to supposed reductions in "individualized attention, serious conversation, and emotional support" in its undue-burden analysis. *Ante*, at 36. But those "facts" are not in the record, so I have no way of addressing them.

[31] See n. 11, *supra.*

[32] The District Court in *Casey* found that 42% of Pennsylvania women "must travel for at least one hour, and sometimes longer than three

if the only clinics in the State were those that would have
remained open if the judgment of the Fifth Circuit had not
been enjoined, roughly 95% of the women of reproductive
age in the State would live within 150 miles of an open
facility (or lived outside that range before H. B. 2).[33]
Because the record does not show why particular facilities
closed, the real figure may be even higher than 95%.

We should decline to hold that these statistics justify
the facial invalidation of the H. B. 2 requirements. The

_____

hours, to obtain an abortion from the *nearest* provider." 744 F. Supp.
1323, 1352 (ED Pa. 1990), aff'd in part, rev'd in part, 947 F. 2d 682
(CA3 1991), aff'd in part, rev'd in part, 505 U. S. 833 (1992). In that
case, this Court recognized that the challenged 24-hour waiting period
would require some women to make that trip twice, and yet upheld the
law regardless. See *id.,* at 886–887.

[33] Petitioners' expert testified that 82.5% of Texas women of reproduc-
tive age live within 150 miles of a Texas surgical center that provides
abortions. See App. 242 (930,000 women living more than 150 miles
away), 244 (5,326,162 women total). The State's expert further testi-
fied, without contradiction, that an additional 6.2% live within 150
miles of the McAllen facility, and another 3.3% within 150 miles of an
El Paso-area facility. *Id.,* at 921–922. (If the Court did not award
statewide relief, I assume it would instead either conclude that the
availability of abortion on the New Mexico side of the El Paso metropol-
itan area satisfies the Constitution, or it would award as-applied relief
allowing petitioner Nova Health Systems to remain open in El Paso.
Either way, the 3.3% figure would remain the same, because Nova's
clinic and the New Mexico facility are so close to each other. See *id.,* at
913, 916, 921 (only six women of reproductive age live within 150 miles
of Nova's clinic but not New Mexico clinic).) Together, these percent-
ages add up to 92.0% of Texas women of reproductive age.

Separately, the State's expert also testified that 2.9% of women of
reproductive age lived more than 150 miles from an abortion clinic
before H. B. 2 took effect. *Id.,* at 916.

So, at most, H. B. 2 affects no more than (100%-2.9%)-92.0%=5.1% of
women of reproductive age. Also recall that many rural clinic closures
appear to have been caused by other developments—indeed, petitioners
seemed to believe that themselves—and have certainly not been shown
to be caused by the provisions challenged here. See *supra*, at 29, and
n. 18. So the true impact is almost certainly smaller than 5.1%.

possibility that the admitting privileges requirement *might* have caused a closure in Lubbock is no reason to issue a facial injunction exempting Houston clinics from that requirement. I do not dismiss the situation of those women who would no longer live within 150 miles of a clinic as a result of H. B. 2. But under current doctrine such localized problems can be addressed by narrow as-applied challenges.

## IV

Even if the Court were right to hold that res judicata does not bar this suit and that H. B. 2 imposes an undue burden on abortion access—it is, in fact, wrong on both counts—it is still wrong to conclude that the admitting privileges and surgical center provisions must be enjoined in their entirety. H. B. 2 has an extraordinarily broad severability clause that must be considered before enjoining any portion or application of the law. Both challenged provisions should survive in substantial part if the Court faithfully applies that clause. Regrettably, it enjoins both in full, heedless of the (controlling) intent of the state legislature. Cf. *Leavitt* v. *Jane L.*, 518 U. S. 137, 139 (1996) (*per curiam*) ("Severability is of course a matter of state law").

## A

Applying H. B. 2's severability clause to the admitting privileges requirement is easy. Simply put, the requirement must be upheld in every city in which its application does not pose an undue burden. It surely does not pose that burden anywhere in the eastern half of the State, where most Texans live and where virtually no woman of reproductive age lives more than 150 miles from an open clinic. See App. 242, 244 (petitioners' expert testimony that 82.5% of Texas women of reproductive age live within 150 miles of open clinics in Austin, Dallas, Fort Worth,

Houston, and San Antonio). (Unfortunately, the Court does not address the State's argument to this effect. See Brief for Respondents 51.) And petitioners would need to show that the requirement caused specific West Texas clinics to close (but see *supra,* at 29, and n. 18) before they could be entitled to an injunction tailored to address those closures.

## B

Applying severability to the surgical center requirement calls for the identification of the particular provisions of the ASC regulations that result in the imposition of an undue burden. These regulations are lengthy and detailed, and while compliance with some might be expensive, compliance with many others would not. And many serve important health and safety purposes. Thus, the surgical center requirements cannot be judged as a package. But the District Court nevertheless held that all the surgical center requirements are unconstitutional in all cases, and the Court sustains this holding on grounds that are hard to take seriously.

When the Texas Legislature passed H. B. 2, it left no doubt about its intent on the question of severability. It included a provision mandating the greatest degree of severability possible. The full provision is reproduced below,[34] but it is enough to note that under this provision

------

[34] The severability provision states:

"(a) If some or all of the provisions of this Act are ever temporarily or permanently restrained or enjoined by judicial order, all other provisions of Texas law regulating or restricting abortion shall be enforced as though the restrained or enjoined provisions had not been adopted; provided, however, that whenever the temporary or permanent restraining order or injunction is stayed or dissolved, or otherwise ceases to have effect, the provisions shall have full force and effect.

"(b) Mindful of Leavitt v. Jane L., 518 U. S. 137 (1996), in which in the context of determining the severability of a state statute regulating abortion the United States Supreme Court held that an explicit state-

"every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act, are severable from each other." H. B. 2, §10(b), App. to Pet. for Cert. 200a. And to drive home the point about the severability of applications of the law, the provision adds:

> "If any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected. All constitutionally valid applications of this Act shall be sev-

_____

ment of legislative intent is controlling, it is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act, are severable from each other. If any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this Act to impose an undue burden in a large or substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed from the remaining provisions and shall remain in force, and shall be treated as if the legislature had enacted a statute limited to the persons, group of persons, or circumstances for which the statute's application does not present an undue burden. The legislature further declares that it would have passed this Act, and each provision, section, subsection, sentence, clause, phrase, or word, and all constitutional applications of this Act, irrespective of the fact that any provision, section, subsection, sentence, clause, phrase, or word, or applications of this Act, were to be declared unconstitutional or to represent an undue burden.

"(c) [omitted—applies to late-term abortion ban only]

"(d) If any provision of this Act is found by any court to be unconstitutionally vague, then the applications of that provision that do not present constitutional vagueness problems shall be severed and remain in force." H. B. 2, §10, App. to Pet. for Cert. 199a–201a.

ered from any applications that a court finds to be in-
valid, leaving the valid applications in force, because
it is the legislature's intent and priority that the valid
applications be allowed to stand alone." *Ibid.*

This provision indisputably requires that all surgical
center regulations that are not themselves unconstitutional
be left standing. Requiring an abortion facility to com-
ply with any provision of the regulations applicable to
surgical centers is an "application of the provision" of H. B.
2 that requires abortion clinics to meet surgical center
standards. Therefore, if some such applications are un-
constitutional, the severability clause plainly requires that
those applications be severed and that the rest be left
intact.

How can the Court possibly escape this painfully obvi-
ous conclusion? Its main argument is that it need not
honor the severability provision because doing so would be
too burdensome. See *ante*, at 38. This is a remarkable
argument.

Under the Supremacy Clause, federal courts may strike
down state laws that violate the Constitution or conflict
with federal statutes, Art. VI, cl. 2, but in exercising this
power, federal courts must take great care. The power to
invalidate a state law implicates sensitive federal-state
relations. Federal courts have no authority to carpet-
bomb state laws, knocking out provisions that are per-
fectly consistent with federal law, just because it would be
too much bother to separate them from unconstitutional
provisions.

In any event, it should not have been hard in this case
for the District Court to separate any bad provisions from
the good. Petitioners should have identified the particular
provisions that would entail what they regard as an undue
expense, and the District Court could have then concen-
trated its analysis on those provisions. In fact, petitioners

*did* do this in their trial brief, Doc. 185, p. 8 in *Lakey* (Aug. 12, 2014) ("It is the construction and nursing requirements that form the basis of Plaintiffs' challenge"), but they changed their position once the District Court awarded blanket relief, see 790 F. 3d, at 582 (petitioners told the Fifth Circuit that they "challenge H. B. 2 broadly, with no effort whatsoever to parse out specific aspects of the ASC requirement that they find onerous or otherwise infirm"). In its own review of the ASC requirement, in fact, the Court follows petitioners' original playbook and focuses on the construction and nursing requirements as well. See *ante*, at 28–29 (detailed walkthrough of Tex. Admin. Code, tit. 25, §§135.15 (2016) (nursing), 135.52 (construction)). I do not see how it "would inflict enormous costs on both courts and litigants," *ante*, at 38, to single out the ASC regulations that this Court and petitioners have both targeted as the core of the challenge.

By forgoing severability, the Court strikes down numerous provisions that could not plausibly impose an undue burden. For example, surgical center patients must "be treated with respect, consideration, and dignity." Tex. Admin. Code, tit. 25, §135.5(a). That's now enjoined. Patients may not be given misleading "advertising regarding the competence and/or capabilities of the organization." §135.5(g). Enjoined. Centers must maintain fire alarm and emergency communications systems, §§135.41(d), 135.42(e), and eliminate "[h]azards that might lead to slipping, falling, electrical shock, burns, poisoning, or other trauma," §135.10(b). Enjoined and enjoined. When a center is being remodeled while still in use, "[t]emporary sound barriers shall be provided where intense, prolonged construction noises will disturb patients or staff in the occupied portions of the building." §135.51(b)(3)(B)(vi). Enjoined. Centers must develop and enforce policies concerning teaching and publishing by staff. §§135.16(a), (c). Enjoined. They must obtain in-

formed consent before doing research on patients. §135.17(e). Enjoined. And each center "shall develop, implement[,] and maintain an effective, ongoing, organization-wide, data driven patient safety program." §135.27(b). Also enjoined. These are but a few of the innocuous requirements that the Court invalidates with nary a wave of the hand.

Any responsible application of the H. B. 2 severability provision would leave much of the law intact. At a minimum, both of the requirements challenged here should be held constitutional as applied to clinics in any Texas city that will have a surgical center providing abortions (*i.e.*, those areas in which there cannot possibly have been an undue burden on abortion access). Moreover, as even the District Court found, the surgical center requirement is clearly constitutional as to new abortion facilities and facilities already licensed as surgical centers. *Whole Woman's Health* v. *Lakey*, 46 F. Supp. 3d 673, 676 (WD Tex. 2014). And we should uphold every application of every surgical center regulation that does not pose an undue burden—at the very least, all of the regulations as to which petitioners have never made a specific complaint supported by specific evidence. The Court's wholesale refusal to engage in the required severability analysis here revives the "antagonistic 'canon of construction under which in cases involving abortion, a permissible reading of a statute is to be avoided at all costs.'" *Gonzales*, 550 U. S., at 153–154 (quoting *Stenberg* v. *Carhart*, 530 U. S. 914, 977 (2000) (KENNEDY, J., dissenting); some internal quotation marks omitted).

If the Court is unwilling to undertake the careful severability analysis required, that is no reason to strike down all applications of the challenged provisions. The proper course would be to remand to the lower courts for a remedy tailored to the specific facts shown in this case, to "try to limit the solution to the problem." *Ayotte* v. *Planned*

*Parenthood of Northern New Eng.*, 546 U. S. 320, 328 (2006).

## V

When we decide cases on particularly controversial issues, we should take special care to apply settled procedural rules in a neutral manner. The Court has not done that here.

I therefore respectfully dissent.

# APPENDIX

App. K to Emergency Application To Vacate Stay in O. T. 2013, No. 13A452, Plaintiffs' Trial Exh. 46

| Clinic Name | Clinic Location | Capacity after Privileges Requirement | Notes | ASC |
|---|---|---|---|---|
| Austin Women's Health Center | Austin, TX | 100% of prior capacity | | |
| International Healthcare Solutions | Austin, TX | | | |
| South Austin Health Center (PP) | Austin, TX | none | | X |
| Whole Women's Health Austin | Austin, TX | 100% of prior capacity | | |
| Whole Women's Health Beaumont | Beaumont, TX | 100% of prior capacity | | |
| Coastal Birth Control Center | Corpus Christi, TX | prob. 100% of prior capacity | | |
| Abortion Advantage | Dallas, TX | none | | |
| Northpark Medical Group | Dallas, TX | | | |
| Dallas Surgical Health Services Center | Dallas, TX | 120 per week | | X |
| Routh Street Women's Clinic | Dallas, TX | 20 per week | Down from ~60 per week | |
| Southwestern Women's | Dallas, TX | 110 per week | | |
| Hill Top Women's Reproductive Health Services | El Paso, TX | prob. 100% of prior capacity | | |
| Reproductive Services | El Paso, TX | none | | |
| Southwest Fort Worth Health Center (PP) | Fort Worth, TX | none | | |
| West Side Clinic | Fort Worth, TX | none | | |
| Whole Woman's Health Fort Worth | Fort Worth, TX | none | | |
| Harlingen Reproductive Services | Harlingen, TX | none | | |
| Affordable Women's Health Center | Houston, TX | | | |
| AAA Concerned Women's Center | Houston, TX | | | |
| Aaron Women's Clinic | Houston, TX | | | |
| Texas Ambulatory Surgical Center | Houston, TX | | | X |
| Alto Women's Center | Houston, TX | | | |
| Houston Women's Clinic | Houston, TX | 130 per week | | |
| Planned Parenthood Center for Choice | Houston, TX | 175 per week | | X |
| Suburban Women's Clinic (SW) | Houston, TX | | | |
| Suburban Women's Clinic (NW) | Houston, TX | | | |
| Planned Parenthood Center for Choice Stafford | Stafford (not in county) | none | | |
| Killeen Women's Health Center | Killeen, TX | none | | |
| Planned Parenthood Women's Health Center | Lubbock, TX | none | | |
| Whole Women's Health of McAllen | McAllen, TX | none | | |
| Dr. Braid (Alamo Women's Reproductive Services) | San Antonio, TX | 100% of prior capacity | | |
| Planned Parenthood Babock Sexual Healthcare | San Antonio, TX | 40/week for ALL San Antonio PP locations | | |
| Planned Parenthood Bandera Rd Sexual Healthcare | San Antonio, TX | none | | |
| Planned Parenthood Northeast Sexual Healthcare | San Antonio, TX | none | | |
| Whole Woman's Health San Antonio | San Antonio, TX | severely limited | | x |
| Audre Rapoport Women's Health Center (PP) | Waco, TX | none | | |